1   STEPHEN YAGMAN
2   723 Ocean Front Walk
    Venice, California 90291-3212
3   (310) 452-3200

4   Attorney for Stephen Yagman



FILED
CLERK, U.S. DISTRICT COURT

MAY 11 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

5
6    **ORIGINAL**

7
8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                   **WESTERN DIVISION**

11  | UNITED STATES OF AMERICA, | No. CV-10-9033-SVW |
    |---|---|

12  UNITED STATES OF AMERICA,          No. CV-10-9033-SVW
                                       (CR-06-227-SVW)
13      Plaintiff,
                                       **SUBMISSION 1 OF 3***:
14
                                       **MEMORANDUM OF POINTS AND**
15      v.                             **AUTHORITIES AND DECLARATION**
                                       **IN SUPPORT OF 28 U.S.C. § 2255**
16  STEPHEN YAGMAN,                    **PETITION AS TO ISSUES OF (1)**
                                       **"PROCEEDING" REQUIRED BY 18**
17                                     **U.S.C. § 157, (2) *MILWITT* JURY**
                                       **INSTRUCTION, (3) "PROFITS"**
18                                     **REQUIRED UNDER 18 U.S.C. § 1957,**
        Petitioner-Movant.            **AND (4) INEFFECTIVE ASSISTANCE**
19                                     **OF APPELLATE COUNSEL**
                                       (02-07-11)
20
                                       Judge Stephen V. Wilson
21

22         Stephen Yagman submits the following Memorandum of Points and

23  Authorities, Declaration, and exhibits in support of his November 4, 2010, 28

24  U.S.C. § 2255 habeas corpus petition.

25

26  //

27  _____

28  * Three, separate submissions are made: (1) submission 2, on vindictive/selective
    prosecution; (2) (this) submission 1, on all other issues; and (3) exhibits.

                                    1

1

2

3        By: _____
                STEPHEN YAGMAN
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

This Memorandum is submitted in support of the habeas corpus case/motion pursuant to 28 U.S.C. § 2255, insofar as the case/motion concerns these issues[1]: (1) as to Count Two, the 18 U.S.C. § 157(2), the bankruptcy charge, not making a distinction between a bankruptcy case and an adversary proceeding within a bankruptcy case; (2) as to Count Two, the failure to instruct as to a necessary element of the charge, under *United States v. Milwitt*, 475 F.3d 1150, 1154-55 (9th Cir. 2007), that, in order for there to be a conviction under § 157(2), it must be proved beyond a reasonable doubt that there was a fraudulent scheme *outside* the bankruptcy; and, (3) as to Counts Three through Nineteen, 18 U.S.C. § 1957, engaging in monetary transactions with property derived from unlawful activity, the failure to charge and to instruct as to a necessary element of the charge, under *United States v. Santos*, 553 U.S. 507 (2008) (plurality), that the property derived is required to be have been "profits"[2] from unlawful activity and it is insufficient for the property to have been mere "proceeds."

Eighteen of the nineteen Counts in this case, all except Count One, materially and adversely were affected by instructional errors that failed to instruct the jury that the offenses could not, as matters of both fact and law, could not have been committed because (1) Count Two required that there had to have been a bankruptcy "proceeding," and (2) Counts Three through Nineteen were required to have involved not mere "proceeds," but "profits." The errors pervaded eighteen of nineteen counts, or nearly 95% of the entire case. The errors hardly were technical and so pervaded the case so that they constituted not harmless, but structural error.

[I]n this case[,] [what occurred] does not warrant the use of

---

[1] A separate Memorandum is submitted as to the issue of vindictive prosecution.
[2] Six of these Counts post-trial were dismissed.

1

1  the harmless-error rule[] . . . [because] the district court's

2  failure to instruct the jury on the lesser included offense . . .

3  was intrinsically harmful structural error which requires us

4  to reverse. *See Sullivan v. Louisiana*, 508 U.S. 275, 281 . . .

5  (1993) . . . . [W]hen an error 'infect[s] the entire trial

6  process, and necessarily render[s] a trial fundamentally

7  unfair [there must be reversal].

8  *United States v. Monger*, 185 F.3d 574, 578 (9th Cir. 1999). Here, together, the

9  three alleged errors of law pervaded the case, 18 of 19 Counts, infected the entire

10 case, and necessarily render the result fundamentally unfair. The pervasiveness of

11 the errors "vitiate[] all the jury's findings" on Counts Two through and including

12 Nineteen. *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).

13      Each of these errors caused decisive prejudice and warrant reversal. In

14 assessing prejudice, in *United States v. Moreland*, 622 F.3d 1147, 1166-67 (9th Cir.

15 2010), the court held that:

16      We also find that the error affected . . . substantial rights.
17      An error prejudices the substantial rights of a defendant when it
        affects the outcome of the proceedings. [Citation omitted.] . . . .
18      There is a high probability that this error affected the jury verdict,
        . . . [¶] [and that t]he . . . error . . . requires us to reverse these
19      convictions because the government has not produced
20      "overwhelming" evidence [to the contrary] .
21

22 (Citing and quoting *United States v. Fuchs*, 218 F.3d 957, 963 [9th Cir. 2000]).

23      The sole reason the instant motion is made is because of the collateral

24 consequences attendant to the convictions for bankruptcy fraud and illegal

25 monetary transactions, to wit, that they operate to prevent the practice of law and

26 render impossible gainful employment.[3]

27

28 _____

[3] Movant has served out his sentence, plus four additional months, and that never
can be undone. *See Yagman v. Meinberg*, CV-10-5860-SVW-CW.

2

# 1. INTRODUCTION

Count Two of the Superseding Indictment charged bankruptcy fraud under 18 U.S.C. § 157(2). It did not properly allege all the essential elements of that Section. Pertinent to the instant proceeding, it failed properly to allege the established distinction in bankruptcy law between a "case" and a "proceeding," the term of art used in bankruptcy cases to distinguish between the main bankruptcy case, or action, and subsidiary matters within the main case, commonly called "adversary proceedings."

Count Two also failed to have a jury instruction to charge the existence of a scheme separate from and outside the bankruptcy case, that the bankruptcy used as a means of executing or concealing the scheme, as required by the Ninth Circuit in *Milwitt*, 475 F.3d at 1154-55. And, the three acts of execution alleged in Count Two involved documents submitted in the personal and corporate bankruptcy cases, and not in a "proceeding" under Title 11, as required by 18 U.S.C. § 157(2). Moreover, there was a complete failure of proof of the element of a § 157(2) charge, that there ever was any "proceeding" within the bankruptcy case, so that as matters of both fact and law it would be possible to commit a violation of § 157(2), and thus conviction was a legal impossibility.

A jury instruction was requested, based on *Milwitt*, to inform the jury that, in order for it to return a conviction on Count Two, "the government must establish beyond a reasonable doubt that Mr. Yagman devised a scheme to defraud *outside of bankruptcy* which used bankruptcy as a means of executing or concealing the scheme." Defendant's Proposed Instruction No. 12 (emphasis added).

On appeal, it was argued that Count Two failed to allege a scheme outside of bankruptcy, as required by *Milwitt*. However, the refusal to give the proposed jury instruction was not challenged, and the "case/proceeding" distinction was not challenged.

It is recognized that courts usually will not entertain a § 2255 motion if the movant did not raise the claim before trial, at trial, or on direct appeal, and that in order to obtain § 2255 relief in the face of such a possible procedural default, the moving party must show both cause for the failure to raise the claim in earlier proceedings and actual prejudice from the alleged error. This "cause" element can be established by a showing of ineffective assistance of counsel. Herein, ineffective assistance of appellate counsel will be argued.  Moreover, all of these issues were raised at trial.

There was no instruction that, as to the monetary transactions Counts, it was required to be proved beyond a reasonable doubt that the monies involved in the transactions were not mere "proceeds," and instead were "profits," as the Court held was required in *United States v. Santos*, 553 U.S. 507 (2008), that was decided a year after the convictions and while the direct appeal was pending. Because there was no factual predicate of "profits" to support the monetary transactions verdicts and no instruction to the jury on this issue, these counts must be reversed.

There is significant, new evidence of vindictive and selective prosecution, that one of the government's agents was lying about the initiation of the investigation of Mr. Yagman, and that warrants reversal of all convictions.

## 2. THERE WAS NO FACTUAL OR LEGAL BASIS FOR CONVICTION UNDER 18 U.S.C. 157(2).

The indictment and one conviction were for violation of 18 U.S.C. § 157(2).[4]

---

[4] Because the word "proceeding" is the predicate in both §§ 157(2) and 157(3), were it contended that there was a conviction under Section 157(3), the same considerations discussed would be applicable to § 157(3) as are applicable to § 157(2).

4

## A. THE STATUTE

Title 18 U.S.C. § 157(2) provides as follows:

A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so--

. . .

(2) files a document in a proceeding under title 11 . . .;

. . .

shall be fined under this title, imprisoned not more than 5 years, or both.

Section 157(2) was enacted as part of the Bankruptcy Reform Act of 1994. Pub.L. No. 103-394, 108 Stat. 4106, 4140, § 312(a)(1)(B) (1994).

Though it could be argued that the word "proceeding" in the Statute means the main bankruptcy case or action, sometimes carelessly and colloquially referred to as a "bankruptcy proceeding," such an argument is foreclosed for at least two reasons.

First, subparagraph (1) of § 157 provides as follows:

"(1) files a case under title 11 . . . .

Were the word "proceeding" in subparagraph (2) of § 157 to be understood to mean the main bankruptcy action that is initiated by the filing of a bankruptcy case, then subparagraph (2) would be redundant of subparagraph (1).

Second, the cannon of strict construction, or the rule of lenity, directs courts to resolve ambiguities in a criminal statute so as to apply it only to conduct the statute clearly covers. *See*, *e.g.*, *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 1225 (1997). Moreover, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Ibid.* On this standard, and upon a reading of both the Statute and the First Superseding Indictment, that charges a violation of *only* § 157(2), due process cannot support a conviction under

5

§ 157(2) because there was no "proceeding" in the bankruptcy case, as that term is understood in bankruptcy law.

This issue turns on whether the word "proceeding" refers to the main bankruptcy case, that is initiated by the filing of a bankruptcy case, or to the bankruptcy term of art "proceeding," that refers to subsidiary "proceedings" had within the bankruptcy case, but not to the main bankruptcy case itself. The word "proceeding" in § 157(2) is inartfully used and is ambiguous. *See infra.*

Under § 157, it is a criminal offense to commit one of three, specified acts for the purpose of executing or concealing a scheme or artifice to defraud. The three prohibited acts are:

> (1) filing a case under title 11;
>
> (2) filing a document in a *proceeding* under title 11; and,
>
> (3) making a false or fraudulent representation, claim, or promise concerning or in relation to a *proceeding* under title 11, at any time before or after the filing of the case.

(Emphases added.)

Count Two of the Superseding Indictment charges the commission of three acts for the purpose of executing the alleged bankruptcy fraud scheme. Paragraph 98 alleges, in part, that on June 28, 2000, there was "submitted to the bankruptcy trustee in connection with a proceeding under title 11, the case of *In re Stephen Yagman, Debtor*, Case No. 99-11958-PCB," a summary of cases in which he failed to list all of the cases in which he had an economic interest at the time he filed his personal bankruptcy case.

The second act of execution, charged in paragraph 99, contains identical language, but relates to a subsequent summary of cases submitted to the personal bankruptcy trustee on July 14, 2000.

6

The third act, charged in paragraph 100, alleges that on April 22, 2002, there was "filed and caused to be filed an opposition to the trustee's motion to dismiss bankruptcy in connection with a proceeding under Title 11, the case of *In re Yagman & Yagman, P.C.*, Case No. 99-50138-ER, in which there was a failure to disclose the statement of cases that were pending at the time the corporate bankruptcy case was filed."

Paragraphs 98 through 100 are intended to charge violations of the second clause of 18 U.S.C. § 157[5], that refers to "filing a document in a *proceeding* under Title 11." (Emphasis added.) It is clear from the text of these paragraphs that the "proceeding under Title 11," for the purposes of the first two acts (¶¶ 98 and 99) is the personal bankruptcy case filed in the Southern District of New York, and that the "proceeding under Title 11," for the purposes of the third act (¶ 100) is the Yagman & Yagman, P.C. corporate bankruptcy in the Central District of California. In all these instances, it was charged that the conduct occurred in "proceedings" though there never was any "proceeding."

There are two, significant problems with these charging paragraphs. First, the case summaries that are the subjects of paragraphs 98 and 99 were not "filed," as required by the second clause of § 157; instead, they simply were "submitted to" the bankruptcy trustee. Second, the allegation in all three paragraphs that the "proceeding under Title 11" is the bankruptcy case itself, ignores the established and recognized distinction in bankruptcy law between "case" and "proceeding."

Title 28 U.S.C. § 1334 governs United States District Courts (of which the bankruptcy courts are parts) jurisdiction in bankruptcy matters. Subsection (a) vests the district courts with original and exclusive jurisdiction of "all cases under Title 11," and subsection (b) confers original *but not exclusive* jurisdiction of "all

---

[5] *See* footnote 1, *supra*.

civil proceedings arising under Title 11, or *arising in* or *related to cases* under
Title 11." (Emphasis added.) Thus, the statutory distinction between "cases" and
"proceedings."

In *In re Middlesex Power Equipment & Marine, Inc.*, 292 F.3d 61, 66 (1st
Cir. 2002), the court explained that "[a] case under Title 11, as that term is used in
§ 1334(a), is the bankruptcy case itself, such as a Chapter 11 reorganization." After
pointing out that the dividing line between the three classes of proceedings referred
to in § 1334(b) is unclear, the court explained that *arising under* proceedings
commonly are understood to be "those cases in which the cause of action is created
by Title 11;" that *arising in* proceedings "generally are those that are based on any
right expressly created by Title 11, but nevertheless, would have no existence
outside of the bankruptcy;" and, that *related to* proceedings have some effect on
the bankruptcy estate, such as altering a debtor's rights, liabilities, options or
freedom of action, or otherwise have an impact upon the handling and
administration of the bankruptcy estate." *Id.* at 68.

In *U.S. v. Wagner*, 382 F.3d 598, 612 (6th Cir. 2004), the court recognized
that "[w]e apply the same test in analyzing § 157(2), except that we are concerned
with the filing of *a document in a proceeding under Title 11* rather than *the filing
of a bankruptcy case.*" (Emphases added.)

In *United States v. Peel*, 595 F.3d 763, 768-69 (7th Cir. 2010), the court
recognized and explained the distinction between a bankruptcy case (subject to
prosecution under § 152[6]) and a bankruptcy proceeding (subject to prosecution
under §§ 157(2) or (3).

---

[6] Of course, a violation of § 157(2), and not of § 152, the main bankruptcy fraud
statute, was charged because venue in the Central District of California was proper
only as to § 157(2), if acts were committed in that District, *viz.*, Instruction 40, ¶ 6
(as to "the first two [of the three] acts of execution, . . . you must . . . find that a
particular act of execution was begun, continued, or completed within the Central

1

2    [Defendant] wanted her claim in the bankruptcy *proceeding*
     dismissed . . . .

3    The term ["adversary proceedings"] refers to proceedings to resolve
     claims within the overall bankruptcy case; a proceeding to object

4    to the discharge of a debt or to determine its dischargeability is a

5    typical adversary proceeding. Fed. R. Bankr. P. 7001(4), (6); *see*

6    *Zedan v. Habash*, 529 F.3d 398, 402-03 (7th Cir. 2008); *In re*
     *Marchiando*, 13 F.3d 1111, 1113-14 (7th Cir. 1994); *In re Duncan*,

7    448 F.3d 725, 726 (4th Cir. 2006). An adversary proceeding is thus

8    part of the bankruptcy but it is not the bankruptcy case itself, as

9    illustrated by the fact that the dismissal of an adversary proceeding
     is an appealable final order even though the bankruptcy case

10   continues. *In re Marchiando, supra*, 13 F.3d at 1113-14.

11   Bankruptcy fraud is fraud committed "in any *case* under title 11" of
     the U.S. Code, 18 U.S.C. § 152(6) . . . .

12   (Emphases added.)

13
          Typically, a "proceeding" also is known as an "adversary proceeding," and
14
15   often an adversary proceeding is a tort or contract suit governed by state law. *See,*

16   District of California"), and since the bankruptcy case was filed in the Southern

17   District of New York, a violation of § 152 properly could be charged only in that

18   District. So, the government made a non-charging violation under § 152 the
     predicate for the "scheme outside the bankruptcy" element of the § 157(2) charge,

19   notwithstanding that the element of the § 157(2) charge, that there shall have been

20   a bankruptcy "proceeding" within the main bankruptcy cases never existed as
     matters of both fact and law. Thus, by pleading around the venue problem, the

21   government in effect charged a violation of § 152 and used it to convict under §

22   157(2), and this was compounded by Instruction 36 that interchangeably used the

23   words "proceeding" and "cases," thus leading the jury to believe that the two,
     different terms of art had the same meaning and that it was not required to find, in

24   order to convict under § 157(2), that in fact, there had been a bankruptcy

25   "proceeding." By using the stratagem of pleading, but not charging, a § 152
     violation, not only did the government succeed in confusing the elements of the

26   two Sections and causing unfair prejudice, but it also achieved that which the

27   Ninth Circuit generically prohibited and condemned in *United States v. Bush*, 626
     F.3d 527, 537 (9th Cir. 2010): "allow[ing] the government to sidestep [*Santos'*]

28   holding by charging money laundering under Section 1957 [rather than Section
     1956]." *See also infra*, for discussion of *Bush*'s further holding.

                                          9

1   *e.g.*, *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007); *Alliance to End*

2   *Repression v. City of Chicago*, 356 F.3d 767, 771 (7th Cir. 2004); *SNA Nut Co. v.*

3   *Haagen-Daz Co.*, 302 F.3d 725, 729 (7th Cir. 2002); *In re Caldor Corp.*, 303 F.3d

4   161, 163-64 (2d Cir. 2002).

5          This distinction is of great consequence and is crucial and determinative in

6   this matter.

7          Here, there never was any "proceeding," as matters of both fact and law. *See*

8   *In re Yagman*, 99-11958-scc, a copy of whose docket sheet is attached hereto.

9          Section 157(2) simply does not criminalize behavior when, as here, there is

10  no bankruptcy proceeding, as that term properly is defined. In *United States v. Lee*,

11  82 F.Supp. 2d 384, 387, 388 (E.D. Pa. 200), the court aptly addressed this issue

12  and refused the application of Section 157(2):

13

14          In assessing whether Lee's conduct is properly charged under

15          18 U.S.C. § 157, we are guided by the cannon of strict construction,
            or the rule of lenity, which directs us to resolve ambiguities in a

16          criminal statute so as to apply it to conduct the statute clearly covers.

17          *See, e.g., United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219,
            1225 . . . (1997). Moreover, "due process bars courts from applying

18          a novel construction of a criminal statute to conduct that neither the

19          statute nor any prior judicial decision has fairly disclosed to be
            within its scope." *Id.* [At 387.]

20          ***

21          [W]e cannot agree that § 157(2) criminalizes this behavior . . . .

22          [At 388.]

23

24          Here, as in *Lee*, and as a matter of law, § 157(2) does not criminalize the

25  subject behavior because a key fact necessary for the behavior to be criminal is that

26  there needed to have been a bankruptcy "proceeding," but there was no bankruptcy

27  "proceeding."

28

10

1        It is beyond cavil that §§ 152 and 157 define separate and different crimes,

2   because the test for "whether there are two offenses or only one is whether each

3   provision requires proof of a fact which the other does not." *Missouri v. Hunter*,

4   459 U.S. 359,  366 (1983) (quoting *Blockburger v. United States*, 284 U.S. 299,

5   304 [1932]). Here, the test is flunked because there was no proceeding within the

6   bankruptcy case, and thus, as a matter of law, there could be no conviction under

7   § 157(2).

8        Since "case" and "proceeding" are bankruptcy terms of art, any contention

9   that paragraphs 98-100 of Count Two that the personal bankruptcy and the

10  Yagman & Yagman, P.C. corporate bankruptcy constitute "a proceeding under

11  Title 11" within the meaning of 18 U.S.C. § 157(2), is based upon an erroneous

12  interpretation of the Statute. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32

13  (1990) ("we must assume that Congress is aware of existing law when it passes

14  legislation").

15       This conclusion is reinforced by an examination of the texts of other statutes

16  that define bankruptcy-related offenses. Section 152 prohibits concealment of

17  assets, false oaths and claims, bribery, and other bankruptcy crimes. Each of the

18  nine sub-paragraphs of § 152 refers specifically to conduct committed in, in

19  connection with, in relation to, in contemplation of, or after the filing of, a "case

20  under Title 11." The term "proceeding" does not appear anywhere in the Statute.

21

22       Moreover, 18 U.S.C. § 156(b), that was enacted at the same time as § 157,

23  provides that "[i]f a bankruptcy case *or related proceeding* is dismissed because of

24  a knowing attempt by a bankruptcy case preparer" to disregard the requirements of

25  Title 11 or the Federal Rules of Bankruptcy Procedure, the case preparer is guilty

26  of a misdemeanor. This is further persuasive evidence that Congress intended the

27  term "proceeding" in § 157(2) to mean something other than the bankruptcy *case*

28  itself. *See United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) ("It is an

11

1    elementary principle of statutory construction that similar language in similar

2    statutes should be interpreted similarly").

3         If "proceeding" means a Chapter 7 case of the kinds filed by Mr. Yagman

4    and his former law firm, Yagman & Yagman, P.C., as charged in Count Two,

5    clause (1) of § 157 becomes superfluous since the conduct prohibited by that

6    clause -- filing "a case under Title 11" -- would be entirely subsumed within clause

7    (2), which prohibits filing "a document in a proceeding under Title 11." Since a

8    "case" obviously is a "document," the term "proceeding" must be accorded special

9    significance in order to avoid reading clause (1) out of the statute, in violation of

10   well-established rules of statutory construction. *See, e.g., TRW, Inc. v. Andrews,*

11   534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a

12   statute ought, upon the whole, to be so construed that, if it can be prevented, no

13   clause, sentence or word shall be superfluous, void or insignificant") (internal

14   quotation marks omitted).

15        The text of clause (2) makes sense only if the term "proceeding" is

16   interpreted to mean an adversary proceeding, a litigated action within the

17   bankruptcy case that is commenced by the filing of a complaint.[7] This

18   interpretation harmonizes § 157(1) with § 157(2), gives meaning to the phrase

19   "filing a document in a proceeding under Title 11" in § 157(2), and explains the

20   reference in § 156(b) to the dismissal of a "bankruptcy case or related proceeding."

21

22        Count Two charges three acts in execution of the alleged fraudulent scheme,

23   all of which involve documents, other than the case, filed in the personal and

24

25   [7] Rule 7001 of the Federal Rules of Bankruptcy Procedure identifies 10 categories

26   of adversary proceedings in bankruptcy cases which are litigated in accordance

27   with the Federal Rules of Civil Procedure. These include such things as "a

     proceeding to object to or revoke a discharge," "a proceeding to determine the

28   dischargeability of a debt," and "a proceeding to determine a claim or cause of

     action" removed to federal court from state court pursuant to 28 U.S.C. § 1452.

1   corporate bankruptcy cases, purportedly in violation of § 157(2). These documents
2   were filed in the Chapter 7 bankruptcy cases themselves, and they were not filed in
3   "a proceeding under Title 11." (As set forth above, the two documents in the
4   personal bankruptcy were not filed at all, but simply were "submitted" to the
5   bankruptcy trustee.) Accordingly, these acts do not, cannot, constitute a violation
6   of § 157(2), so that an element of the offense proscribed by § 157(2), a proceeding,
7   is not present.
8       A bankruptcy case or action is initiated by the filing of a bankruptcy case.
9   Upon the filing of the case, there is born a bankruptcy "action" or "case." Often,
10  carelessly, colloquially, that action or case is called a bankruptcy "proceeding."
11  This is a factual and legal misnomer: incorrect diction.
12      In fact and in law, the case or action is not a "proceeding," and the word
13  "proceeding" has a separate and different meaning in the bankruptcy context.
14      There is a bankruptcy case or action and there *may* arise within a bankruptcy
15  case or action a bankruptcy proceeding. Or, as here, there may not.
16      The bankruptcy case or action is initiated by the filing of a case, and is
17  assigned a case number. (A bankruptcy proceeding is not assigned a case number.)
18
19      A bankruptcy proceeding is a matter either that was begun before and
20  outside the principal bankruptcy case or was begun after and inside the principal
21  bankruptcy action. Both types of matters properly are called "proceedings" inside
22  the bankruptcy case. They are litigated within the bankruptcy action, as though the
23  bankruptcy court were a civil court hearing a civil action. A bankruptcy proceeding
24  is not an original, independent, free-standing matter, but instead is a case within a
25  case and is pendent within or ancillary to the main bankruptcy action.
26      Title 18 U.S.C. § 152, the principal bankruptcy fraud statute, under which
27  there was no charge or conviction, applies to original bankruptcy cases that are
28

13

1   begun by the filing of a case, whereas § 157(2), which *was charged*[8], applies only

2   to proceedings *within* the bankruptcy action, a species of pendent proceedings.

3   (Also, § 157[1] applies to the filing of a bankruptcy case and, as set forth

4   hereinabove, were subsection [2] read to refer to the case, then it would be

5   redundant of subsection [1].)

6       This error was compounded and aggravated by the fact that Jury Instruction

7   36 was given.[9] In it, the court variously used the words "proceeding," "bankruptcy

8   proceeding," and "bankruptcy cases," thus destroying the legal distinction between

9   a bankruptcy "case" or "action, on the one hand, and a bankruptcy "proceeding,"

10  on the other hand. Thus, the jury never was instructed that the conduct charged in

11  Count Two necessarily must have occurred in a "proceeding," when, in fact and

12  law, there never was such a "proceeding." Based on this Instruction, the jury most

13  likely convicted on Count Two based not on a finding beyond a reasonable doubt

14  that the charged conduct occurred in a "proceeding," but instead based on a finding

15  that the charged conduct occurred with respect to the bankruptcy cases. Further

16

17  _____

18  [8] Section 157, instead of § 152, was charged so that the case, as to the personal
    bankruptcy, could be brought in the Central District of California, because § 152 as
19  to the personal bankruptcy would have had to have been charged in the Southern
    District of New York, where the personal bankruptcy was filed. The § 157 charge
20  as to the personal bankruptcy properly should have been filed under § 152, and not
    under § 157, as is demonstrated by a plethora of cases all involving factual
21  situations dealing with the alleged concealment of assets in a bankruptcy case
    and/or having to do with property belonging to a debtor in the name of a nominee.
22  *See, e.g., United States v. Butler*, 211 F.3d 826 (4th Cir. 2000); *United States v.
    Ladum*, 141 F.3d 1328 (9th Cir. 1998); *United States v. Levine*, 970 F.2d 681 (10th
23  Cir. 1992); *United States v. Golb*, 69 F.3d 1417 (9th Cir. 1995), *cert. denied*, 517
    U.S. 1127 (1996); *United States v. Sabbeth*, 262 F.3d 207 (2d Cir. 2001). Yet, an
24  element for the § 157 charge, the existence of a "proceeding," was non-existent.
25
26
27  [9] The number of the Instruction refers to the page number in the header of the Jury
    Instructions filed on June 22, 2007, Doc. 435, a copy of which is attached hereto.
28  Instructions 30-42 address the substantive charge as to Count Two.

1  support for this contention is found in the fact that a violation of § 152, the

2  principal bankruptcy fraud statute, was charged as the predicate for the monetary

3  transactions Counts, Three through Nineteen, as the "scheme outside the

4  bankruptcy," and to convict on those Counts, the jury had to have found a violation

5  of the non-charged allegation of violations of § 152.

6        The failure to instruct the jury on the difference between a bankruptcy

7  "case" or "action," on the one hand, and a bankruptcy "proceeding," on the other

8  hand, constituted an error that resulted in the wrongful conviction on both Count

9  Two and Counts Three through Nineteen. Moreover, the court previously found

10  that a rational jury could not have convicted on six of the § 1957 Counts, and thus

11  there is a basis for the contention that the jury did not act rationally at all. *Cf.*

12  *Falsus in uno, falsus in omnibus*, the Roman legal principle.

13                    **3. THE *MILWITT* JURY INSTRUCTION ISSUE**

14        Count Two also failed to have a jury instruction to charge the existence of

15  scheme separate from and outside the bankruptcy case, for which the bankruptcy

16  case was used as a means of executing or concealing the scheme, as required by

17  the Ninth Circuit decision in *Milwitt*, 475 F.3d at 1154-55,

18        In general, a court reviewing jury instructions determines "whether,

19  considering the charge as a whole, the court's instructions fairly and adequately

20  covered the issues presented, correctly stated the law, and were not misleading.

21  *Coursen v. A.H. Robbins Co.*, 773 F.2d 1329, 1337 (9th Cir.), *modified*, 773 F.2d

22  1049 (9th Cir. 1985)." *Thorsted v. Kelly*, 858 F.2d 571, 573 (9th Cir. 1988).

23        Yet, the Supreme Court has made clear that a failure to instruct the jury on

24  an essential element of the charged offense is constitutional error. As the Court

25  explained in *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995):

26

27        The Fifth Amendment to the United States Constitution
28        guarantees that no one will be deprived of liberty without

15

1
2
3
4
5
6

> "due process of law," and the Sixth [Amendment provides
> that] "in all criminal prosecutions, the accused shall enjoy
> the right to a speedy and public trial, by an impartial jury."
> We have held that these provisions require criminal
> convictions to rest upon a jury determination that the
> defendant is guilty of every element of the crime with which
> he is charged beyond a reasonable doubt.

7
8
9

Here, there was constitutional error in not giving a proposed jury instruction that provided an element of the offense charged. And, it was structural error. *See infra.* (And there was constitutional error in the wording of Instruction 36, *supra.*)

10
11
12
13
14

An essential element of § 157 is that the illegal conduct must have occurred in a "proceeding" within the main bankruptcy case: Section 157(2) ("files a document in a proceeding under title 11") & (3) ("makes a false or fraudulent representation, claim, or promise concerning or in relation to a proceeding under title 11"). Here, there was no such proceeding. *See* bankruptcy docket.

15
16
17
18

Prior to the Court's decision in *United States v. Neder*, 527 U.S. 1 (1999), the Ninth Circuit had held that omitting an essential element of an offense in jury instructions cannot be deemed harmless error. *See, e.g., United States v. Hove*, 52 F.3d 233 (9th Cir. 1995).

19
20
21
22
23
24
25
26

However, in *Neder*, the Court held that a jury instruction that omits an essential element of an offense *usually*[10] is not the kind of structural error that renders the entire trial process fundamentally unfair. Rather, such an omission is subject to harmless error constitutional analysis as set forth in *Chapman v. California*, 386 U.S. 18 (1967); that is, whether it appears beyond a reasonable doubt that the error in question did not contribute to the verdict rendered. The Court noted that this standard can be satisfied when, for example, the omitted

27
28

[10] But see *Monger* and *Sullivan*, *supra* at p. 2. Here, the omission does constitute structural, and not harmless, error.

16

1    element of the offense was uncontested *and*[11] supported by overwhelming

2    evidence. *Neder*, 527 U.S. at 8-20. *Accord*, *United States v. Munoz*, 412 F.3d 1043

3    (9th Cir. 2005) ("A district court's failure properly to instruct the jury on an

4    essential element of the offense is harmless *if* we can conclude that it is clear

5    beyond a reasonable doubt that a rational jury would have found the defendant

6    guilty absent the error." [Emphasis added]).

7         However, even after *Neder*, there continue to be instructional errors that are

8    not subject to harmless error review, and thus warrant reversal. These errors are so-

9    called "structural errors." Here, they are present.

10        In *Neder*, in affirming the Eleventh Circuit, the Court found that the trial

11   court's failure to submit a materiality instruction *was* subject to harmless error

12   review since "the error was harmless because 'materiality was not in dispute'

13   [citation omitted], and thus the error 'did not contribute to the verdict obtained.'"

14   Here, because the *Milwitt* issue was hotly disputed, therefore, under *Neder*,

15   harmless error review would be inappropriate. *Cf.* Rule 52(a), F.R. Crim. P. ("Any

16   error, defect, irregularity or variance which does not affect substantial rights shall

17   be disregarded.") An instructional error that does involve an element of a crime

18   that is hotly contested *per se*, under *Neder*, is not subject to harmless error review.

19   Thus, the failure to give the *Milwitt* instruction is not a harmless error, because

20   *Neder* recognizes "a limited class of fundamental constitutional errors that 'defy

21   analysis by "harmless error" standards.' *Arizona v. Fulminante*, 499 U.S. 279, 309

22   . . . (1991); *see Chapman v. California*, 386 U.S. at 23 . . . . Errors of this type are

23   so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial

24   rights') without regard to their effect on the outcome." 527 U.S. at 7.

25

26

27

---

28   [11] *See Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir. 1999), *infra*, the Ninth
     Circuit's first decision interpreting *Neder*, rendered just 120 days after *Neder*.

1    Moreover, in *Neder* the Court significantly limited its holding on omission

2    from the jury instruction of the materiality element of the charged offense,

3    warranting harmless error review, by stating that the "omitted element is supported

4    by uncontroverted evidence," *id.* at 18, and by immediately following that

5    limitation with the statement that "we have recognized that trial by jury in serious

6    criminal cases 'was designed "to guard against a spirit of oppression and tyranny

7    on the part of rulers[,]"'" *id.* at 19, to emphasize the limited proper use of harmless

8    error review at all, unless procedural and evidentiary facts warrant such review. In

9    *Neder*, the Court further limited its holding by stating:

10

11        In a case such as this one, where a defendant did not, and apparently
12        could not, bring forth facts contesting the omitted element,
             answering the question whether the jury verdict would have been the
13        same absent the error does not fundamentally undermine the purposes
14        of the jury trial guarantee.

15        Of course, safeguarding the jury guarantee will often require that a
16        reviewing court conduct a thorough examination of the record. If at
             the end of that examination, the court cannot conclude beyond a
17        reasonable doubt that the jury verdict would have been the same
18        absent the error - for example, where *the defendant contested the*
             *omitted element and raised evidence sufficient to support a*
19        *contrary finding* - it should not find the error harmless.

20
21        [I]n typical appellate-court fashion, [as court] asks whether the
             record contains evidence that could rationally lead to a contrary
22        finding [as to guilt] with respect to the omitted element. . . .
23        [Harmless error review] "block[s] setting aside convictions
             for small errors or defects that have little, if any, likelihood
24        of having changed the result of the trial." *Chapman*, 386 U.S.
25        at 22 . . . .

26    *Ibid.* (emphasis added). *Cf. Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)

27    (recognizing application of the qualified immunity defense to constitutional

28    violations only when the underlying claim is "insubstantial:" "In identifying

18

1   qualified immunity as the best attainable accommodation of competing values

2   [citations omitted] . . . we relied on the assumption that this standard would permit

3   '[i]nsubstantial lawsuits [to] be quickly terminated.'" [Citations omitted.])

4   Here, the error is not subject to harmless error review at all and the constitutional

5   error requires automatic reversal.

6       First, a court must determine whether an instructional error is subject to

7   harmless error review at all. *See, e.g., United States v. Monger*, 185 F.3d 574, 577-

8   78 (1st Cir. 1999). "[E]vidence at trial . . . [*may*] not warrant the use of the

9   harmless-error rule[] . . . [when there was] an intrinsically harmful structural error

10  which requires us to reverse. *See Sullivan v. Louisiana*, 508 U.S. 275, 281 . . .

11  (1993)." *Id.* at 578 (dealing with failure to give instruction on lesser included

12  offense).

13      Still, if harmless error review were to be employed, reversal would be

14  warranted, under *Neder* and the cases that followed it.

15      The burden of demonstrating that the error was harmless belongs to the

16  government. *See O'Neal v. McAninch*, 513 U.S. 432, 444-45 (1995); *United States

17  v. Olano*, 507 U.S. 725, 734 (1993); *Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir.

18  1999). *See also, United States v. Jadlowe*, 2010 WL 4962855 * 14 (1st Cir. 2010).

19

20      For most constitutional errors, the government must show that the error was

21  harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24. *Cf. Kotteakos v.

22  United States*, 328 U.S. 750, 776 (1946) (for most non-constitutional errors, the

23  government must show that the error did not have a "substantial and injurious

24  effect or influence in determining the jury's verdict.").

25      Here, unlike in *Neder*, the government's allegations concerning the existence

26  of a fraudulent scheme *outside* of the bankruptcy - the omitted *Milwitt* element -

27  contained in Count One, and incorporated by reference in Count Two, strenuously

28  were contested at trial. Also, the fact that the jury returned a guilty verdict on

19

1   Count One does not lead to the conclusion that the evidence of the existence of a

2   scheme to defraud outside of the bankruptcy was overwhelming, since the jury was

3   not required to find such a scheme in order to convict on Count One.

4       *Chapman* sets forth the standard for determining whether a constitutional

5   error is harmless. 386 U.S. at 24. That test is "whether it appears 'beyond a

6   reasonable doubt that the error complained of did not contribute to the verdict

7   obtained." *Ibid.* Put another way, "an otherwise valid conviction should not be set

8   aside if the reviewing court may confidently say, on the whole record, that the

9   constitutional error was harmless beyond a reasonable doubt." *Deleware v. Van*

10  *Arsdall*, 475 U.S. 673, 681 (1986).

11      Post-*Neder* cases support the premise that there is at least a two-part

12  requirement that, when an offense element has been omitted from a jury

13  instruction, the issue be *both* uncontested *and* supported by overwhelming

14  evidence for there to be a finding that the omission constitutes harmless error, and

15  that overwhelming evidence does not mean merely enough evidence to support a

16  guilty verdict. Indeed, there is a multi-part analysis that must be employed to

17  determine if an error is harmless, and it utilizes terms such as: (1) "the record

18  leav[ing] *no doubt*" of guilt; (2) the error "*almost certainly* ha[ving] no influence

19  on the jurors' ultimate evaluation of . . . guilt or innocence;" (3) "*overwhelming*

20  proof of guilt;" and, (4) "harmless *beyond a reasonable doubt*." *Jadlowe*, 2010 WL

21  4962855 at * 15.

22      In *United States v. Prigmore*, 243 F.3d 1, 21 (1st Cir. 2001), applying

23  *Neder*'s harmless error test to strength of evidence, the court stated that

24

25          the government in substance contends that, even if erroneous, the
            district court's failure to define the underlying regulatory terms
26          was unimportant because it was harmless beyond a reasonable
            doubt within the meaning of *Neder* . . . . The government suggests
27          that, as in *Neder*, it is here "clear beyond a reasonable doubt that a
            rational jury would have found" defendants guilty even if properly
28

20

1    instructed.

2       . . .

3    [T]he evidence of guilt in this case is *quite substantial*; certainly, it is
     more than sufficient to permit a retrial on a properly formulated

4    theory that defendants conspired to defraud the FDA . . . . We do not
     believe, however, that the *evidence is so one-sided* as to render

5    harmless the underlying instructional error . . . [and] we do not see

6    this as a case, like *Neder*, where it is *far-fetched* to conclude that a
     properly instructed jury might have returned different verdicts than

7    those returned.

8       . . .

9    In any event, while the government's evidence of the purpose behind
     the testing was strong, the competing evidence was *not inherently*

10   *incredible*. That effectively ends the matter.

11

12   (Emphases added.) In other words, an error may not be deemed harmless unless it

13   is clear beyond a reasonable doubt that, conjunctively, (1) evidence of guilt is quite

14   substantial, (2) evidence of guilt is completely one-sided, (3) it is far fetched to

15   conclude that a properly-instructed jury could have reached a different verdict, *and*

16   (4) even when the government's evidence is strong, the competing evidence was

17   not inherently incredible. Here, none of these factors, much less all of them

18   conjunctively, is satisfied, and thus the instructional error is not, much less beyond

19   a reasonable doubt, harmless.

20       In *Moreland*, 622 F.3d at 1166, the court held the following with respect to

21   an instructional error in which an element of the offense was left out:

22   "'Any omission or misstatement of an element of an offense
     in the jury instructions is constitutional error and, therefore,

23   requires reversal unless we find the error 'harmless beyond a

24   reasonable doubt.'" *United States v. Kilbride*, 584 F.3d 1240,
     1247 (9th Cir. 2009) (quoting *Chapman v. California*, 386 U.S.

25   18, 24 . . . (1967)).

26       . . .

27   An error prejudices the substantial rights of a defendant when it

28   affects the outcome of the proceedings. *United States v. Fuchs*,
     218 F.3d 957, 962 (9th Cir. 2000). . . . We conclude that there

21

1   is a high probability that this error substantially affected the
2   jury verdict[] . . . [and] requires us to reverse these convictions
3   because the government has not produced "*overwhelming*"
    evidence [to prove the element omitted from the instructions]."
4
5   (Emphasis added.)
6       Thus, in the Ninth Circuit, a finding of harmless error must be supported by
7   a finding that the government has produced "overwhelming" evidence of a scheme
8   to defraud outside of the bankruptcy. Here, it didn't do that, and this warrants
9   reversal of Count Two.
10      In *Keating*, 191 F.3d at 1062, the court held that the instructional error was
11  not harmless because
12
13      [t]he state does *not* argue that even if the jury convicted Keating as
        a direct perpetrator the instructional error was harmless because
14      "the omitted element was uncontested *and* supported by
        overwhelming evidence, such that the jury verdict would have
15      been the same absent the error." *Neder, supra.* Nor does [the
16      government] contend that a review of the record would establish,
        under the applicable harmless error standard, that the jury would
17      have found that Keating had the [omitted offense element]
        required under the statute, rendering any due process violation
18      harmless.
19
20  (First emphasis in original, second emphasis added.) Thus, in order for an error to
21  be harmless it must have been *both* uncontested *and* supported by overwhelming
22  evidence. Here, because the element of a scheme outside of the bankruptcy was
23  hotly contested and the existence of the scheme was not supported by
24  overwhelming evidence, therefore, the instructional error was not harmless and
25  reversal of the verdict is warranted.
26
27      Additionally, the instructional error resulted in the verdict on Count Two
28  potentially being based on a legally invalid ground, to wit, that there could be a
    conviction for violation of § 157(2) without there having been a scheme outside of

22

1   the bankruptcy. That is, the jury may have convicted on Count Two without

2   finding a scheme outside the bankruptcy because the jury simply was not told it

3   needed to find such a scheme to convict on Count Two. This also constitutes

4   constitutional error.

5          [T]he state contends that the error was harmless because
6          the jury . . . did not rely on the legally erroneous theory.

7          The fundamental rule that applies when a jury delivers a
8          general verdict that may rest . . . on a . . . legally invalid
9          ground is clear: the verdict may not stand when there is no
           way to determine the basis [for the verdict]. . . .
10

11   *Keating*, 191 F.3d at 1062. "[T]he proper rule to be applied is that which requires a

12   verdict to be set aside in cases where the verdict is [not] supportable on one

13   ground, . . . and it is impossible to tell which ground the jury selected." *Yates v.*

14   *United States*, 354 U.S. 298, 312 (1957). Here, because it is impossible to tell

15   whether the jury believed it could, and therefore did, convict on Count Two

16   without proof beyond a reasonable doubt of a scheme outside of the bankruptcy,

17   therefore, application of the proper rule requires the verdict on Count Two to be set

18   aside. "Jurors are not generally equipped to determine whether a particular theory

19   of conviction submitted to them is contrary to law," *Griffin v. United States*, 502

20   U.S. 46, 59 (1991), and therefore, "a conviction must be overturned if one of the

21   theories that was submitted to the jury was *legally* erroneous." *Keating*, 191 F.3d at

22   1062 (emphasis added.) Here, the theory submitted to the jury was that there could

23   be a conviction on Count Two absent a scheme outside the bankruptcy, this was

24   contrary to law, and therefore the conviction on Count Two must be overturned

25   because the theory submitted to the jury was legally erroneous. Indeed, the Ninth

26   Circuit "consistently [has] interpreted Supreme Court precedent to require reversal

27   in any case in which a verdict *may* have rested on a legally invalid ground." *Ibid.*

28   (citations omitted). See also, *United States v. Barona*, 56 F.3d 1087, 1098 (9th Cir.

23

1   1995) ("Where the jury is presented with a legally inadequate theory, . . . *Yates*
2   [*see supra*] requires that the conviction be vacated"). The Ninth Circuit has
3   "applied the same reasoning in habeas cases, . . . [because] the conviction must be
4   reversed when  it is not possible to determine whether the jury relied upon the
5   erroneous theory to convict the defendant. *See Suniga v. Bunnell*, 998 F.2d 664,
6   667, 669-70 (9th Cir. 1993)." *Keating*, 191 F.3d at 1063.

7        Only when "'it is *absolutely certain*' that the jury relied upon [a] legally
8   correct theory to convict the defendant" is "[t]here a limited exception to the
9   [automatic reversal] principle . . . ." *Ibid.* (quoting *Ficklin v. Hatcher*, 177 F.3d
10  1147, 1151 [9th Cir. 1999] [emphasis in original]). Here, because there is no way of
11  knowing, much less is it "absolutely certain," that the jury didn't rely on the
12  legally-incorrect theory that there could not be a conviction on Count Two were
13  there not a scheme outside of the bankruptcy, therefore there must be a reversal of
14  that conviction. *See also, Ficklin v. Hatcher*, 177 F.3d 1147, 1152 (9th Cir. 1999)
15  (affirmance of a conviction when a jury was instructed on a legally-erroneous
16  theory is permissible only in "situations in which this Court determines that it was
17  *impossible* for the jury to have relied on the infirm instruction," and this did "not
18  suggest that a general verdict can be sustained if there is 'ample' evidence
19  presented on a constitutional theory or if the prosecution 'relied primarily' on a
20  constitutional theory." [Emphasis in original.]).
21  
22       Here, because the court could not determine that it was *impossible* for the
23  jury to have relied on the lack of a the *Milwitt* instruction that there was required to
24  be an *outside*-the-bankruptcy scheme, and/or because the jury may have returned a
25  guilty verdict on Count Two without finding an extra-bankruptcy scheme, the
26  omission of that essential element of the offense charged in Count Two from the
27  jury instructions violated due process and requires reversal. *Keating*, 191 F.3d at
28  1065. In the circumstance, it is structural error. *Monger*, 185 F.3d at 578.

24

## 4. THE MONETARY TRANSACTIONS CHARGES DID NOT INCLUDE A MATERIAL ELEMENT AND THE CONVICTIONS MUST BE REVERSED.

Instructions 45-52 cover unlawful monetary transactions, charged as Counts Three through Nineteen.

Instructions 45, 46, 48, and 52 to describe the subject of the transactions use, respectively, the words: "derived from," 45; "criminally derived property," "proceeds," "proceeds," and "criminally derived," 46; "derived from," "derived from," 48; and "'Proceeds,'" 52.

In June, 2008, the Court decided *Santos*. In it, the Court held that only "profits" could support a charge under 18 U.S.C. § 1957. Here, because it was not charged, proved, or instructed that proof beyond a reasonable doubt of "profit" was required to convict, therefore, the remaining monetary transaction charges must be dismissed, and the six previously-dismissed Counts also should be dismissed on this additional ground.

In *United States v. Bush*, 626 F.3d 527, 529 (9th Cir. 2010)[12], the Ninth Circuit held that "*Santos* applies to Section 1957 convictions," that "the district court did not specifically instruct the jury that 'proceeds' must include 'profits[,]'" *id.* at 537, and that 18 U.S.C. §§ 1956 and 1957 are to be construed *in pari materia. Id.* at 536-37.

In *Moreland*, 622 F.3d at 1166, the Ninth Circuit held that "[b]ecause the jury instructions [on monetary transactions] should have defined proceeds as profits, these instructions were erroneous." The court continued that "where the law at the time of trial was settled and clearly contrary to the law at the time of

---

[12] *Bush* tracks *Moreland*, and the two cases have proceeded on parallel tracks, in that *Bush* relies on a prior iteration of *Moreland*.

1  appeal - it is enough that an error be plain at the time of appellate consideration[,]"

2  [citation omitted and internal quotation marks omitted]," and that "[t]he district

3  court's failure to instruct the jury that proceeds must be profits therefore

4  constitutes an error that is plain."

5     In assessing the prejudice, the court held that

6     > We also find that th[is] error affected Moreland's substantial rights.
       > An error prejudices the substantial rights of a defendant when it
7      > affects the outcome of the proceedings. [Citation omitted.] [T]he
       > jury instructions . . . should have specified that proceeds must be
8      > profits. We conclude that there is a high probability that this error
9      > affected the jury verdict, . . . [¶] [and that t]he instructional error
       > . . . requires us to reverse these convictions because the
10     > government has not produced "overwhelming" evidence that the
11     > proceeds involved in these counts were in fact profits.
12

13 *Id.* at 1166-67 (citing and quoting *United States v. Fuchs*, 218 F.3d 957, 963 [9th

14 Cir. 2000]).

15     For the reasons set forth, all of the unlawful monetary transactions Counts

16 should be dismissed because the transactions were not alleged or proved to be in

17 profits.

18

19     **5. THERE WAS INEFFECTIVE ASSISTANCE OF APPELLATE**
20                              **COUNSEL.**

21     Appellate counsel was ineffective in that he failed and refused adequately to

22 consult with trial counsel, failed and refused to consult with movant and did not

23 permit movant to have input into the issues raised on appeal, apparently did not

24 read the trial transcript, apparently did not read important pre-trial motions, was

25 inattentive in his formulation of issues and drafting the appellate briefs[13],

26

27 ─────────────────────

28 [13] One small evidence of this is that the caption of the Opening Brief listed the
   name of the case not as *United States of America v. Stephen Yagman*, but instead as
   *Stephen Yagman v. United States of America*.

1   apparently permitted the brief to be written by a first-year law student, failed to

2   include any record citations in the Opening Brief, refused to permit movant to read,

3   much less contribute to, the Opening Brief, Declaration of Stephen Yagman,

4   attached hereto, and, as a result of the foregoing, failed to include on appeal the

5   issues raised in the instant Memorandum. (The factual circumstances under which

6   this occurred are set out fully in the Yagman Declaration.)

7           "[T]he right to counsel is the right to the effective assistance of counsel."

8   *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  Ineffective assistance of

9   counsel can result from failing to render "adequate legal assistance." *Cuyler v.*

10  *Sullivan*, 446 U.S. 335, 344 (1980).

11          In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Court laid out

12  the two ineffective assistance of counsel ("IAC") components: (1) "counsel's

13  performance was deficient," and (2) "that the deficient performance prejudiced the

14  defense." *See also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("An ineffective

15  assistance claim has two components: . . . counsel's performance was deficient,

16  and . . . the deficiency prejudiced the defense." [Citing *Strickland*, 466 U.S. at

17  687]).

18          To render effective assistance, counsel has "particular duties to consult with

19  the defendant on important decisions and to keep the defendant informed of

20  important developments . . . ." *Id.* at 688. Consultation did not occur, at all.

21          "The proper measure of attorney performance remains simply

22  reasonableness under prevailing professional norms[,]" *ibid.*, and to make out a

23  viable IAC claim, "a defendant need not show that counsel's deficient conduct

24  more likely than not altered the outcome in the case." *Id.* at 693. Thus, when it is

25  shown that a decision not to include viable issues on appeal was not reasonable, it

26  is not required to show that the decision actually would have altered the case

27  outcome. The decision not to include the three issues raised hereinabove on appeal

28

                                            27

more likely than not *would have altered* the case outcome. In this regard, the IAC test is circular because if a decision not to include an important and viable issue on appeal would alter the case outcome, then, *ipso facto*, there will have been ineffective assistance of counsel, and also prejudice. Such is the case here.

Here, there was no "tactical judgment not to present [issues on appeal]," *Wiggins*, 539 U.S. at 521, and, as in *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (applying *Strickland*), in which the IAC claim was held to be meritorious, what counsel did "could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to [be] thorough . . . ." *Wiggins*, 539 U.S. at 522 (quoting *Williams*, *loc. cit.* and 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 [2d ed. 1980]).

"[A]n objective review of [counsel's] performance[] [is a] context-dependent consideration of the challenged conduct . . . ." *Id.* at 523 (citation omitted). Here, there simply is no legitimate reason for failing to include in the Opening Brief the identified appellate issues, issues that counsel was asked to include, that were fully briefed in pre-trial motions, (except the *Santos* issue) and issues whose proper determination would have influenced the outcome. Here, there is plausible explanation for the decision not to include these issues in the Opening Brief. "Counsel had available to [him]," *ibid.*, both the issues and the briefing on them.

As in *Wiggins*, "[t]he scope of [what counsel failed to do] was . . . unreasonable in light of what counsel actually [knew,] . . . [and t]he record . . . underscores the unreasonableness of counsel's conduct by suggesting that failure . . . resulted from *inattention*, not reasoned strategic judgment." *Id.* at 526 (emphasis added). In the instant matter, during the time appellate counsel was working on the Opening Brief, June through early September, 2008, he closed down his office at Duke Law School, went on vacation to Europe for several

28

weeks, returned to Durham, N.C. to move from there to Irvine, California, moved at the end of June, and then began to set up UC Irvine Law School, by attending numerous meetings, by participating in fund raising and public appearances, by securing building space, finding, interviewing, and hiring staff and faculty, setting up a law library, and doing the multitude of things that the enormous, labor-intensive, and time-consuming job of setting up an entirely new law school entails. He had insufficient time to devote to formulating and writing the Opening Brief and had virtually no contact with his client, who, along with members of his client's trial team and his client's law partner asked him to include in the Opening Brief the three, identified issues. A dearth of time and inattention resulted in those issues not being included in the Opening Brief. This was, perhaps, the busiest time in counsel's entire life, and it is suggested he became inattentive to his client's appeal.

In *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002),

> Turner argue[d] that appellate counsel was deficient because he did not raise on direct appeal [various claims] . . . . Claims of ineffective assistance of appellate counsel are reviewed according to the standard announced in *Strickland v. Washington*, 466 U.S. 668, 687-90 . . . (1984) (requiring counsel's performance to be both deficient and prejudicial).

> [A]ppellate counsel [is] not ineffective for failing to raise [a] meritless claim . . . [because a] failure to raise untenable issues on appeal does not fall below the *Strickland* standard.

*See also, Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980) ("There is no requirement that an attorney appeal issues that are clearly untenable.").

Here, perforce, it *is ineffective* to fail to raise a meritorious claim or a tenable claim, and if that failure is prejudicial, *see supra*, then reversal is required.

In *Featherstone v. Estelle*, 948 F.2d 1497, 1506-07 (9th Cir. 1989), in which an IAC claim regarding appellate counsel was made, the court held:

29

1  petitioner must demonstrate first that his counsel made professional
2  errors, and second, that were it not for these errors it is reasonably
3  *possible* that he would have received a more favorable result.
   *Strickland v. Washington*, 466 U.S. 668 . . . (1984).

4
5  [The test is:] is [it] reasonably *possible* that had it [the mistake] not
   occurred, [would] caseer . . . have been acquitted[?]
6

7  (Emphases added and word order inverted in second paragraph.) In *Featherstone*,

8  "the jury was properly advised" as to an improper prosecution argument and

9  "caseer was not prejudiced by appellate counsel's decision not to raise issues that

10  had no merit." *Id.* at 1507. Here, contrariwise, it is contended that the jury was not

11  properly instructed on at least two issues and appellate counsel decided not to raise

12  at least three issues on appeal that *had merit*, and thus the second *Strickland* prong,

13  prejudice, is met.

14  ### 6. CONCLUSION

15  Three, significant *possibly* result-changing issues were not raised on appeal,

16  though it was sought that they be raised on appeal. Each and all of those issues

17  should be addressed on their merits.

18  Inattention of appellate counsel rendered assistance of counsel ineffective,

19  there was no legitimate reason not to raise those three issues on appeal, and great

20  prejudice resulted from their omission.

21  Fairness and justice require consideration on their merits of those three

22  issues: (1) that there not having been a "proceeding" in bankruptcy rendered

23  legally impossible conviction under 18 U.S.C. § 157(2) (or [3]); (2) the failure to

24  give a *Milwitt* instruction caused the jury not to deliberate and decide the issue of

25  whether or not there was a scheme to defraud outside the bankruptcy, thus

26  rendering conviction under § 157(2) a legal impossibility; and (3) that there not

27  having been either alleged or proved that the monetary transactions charged under

28  § 1957 consisted of "profits," as required by *Santos*, rendered convictions under

30

1  § 157 legally impossible.

2      Therefore, the convictions under §§ 157(2) and 1957 have no legal or factual

3  bases, were legally impossible, and should be reversed.

4      A separate Memorandum is submitted concurrently herewith to address the

5  issue of selective/vindictive prosecution.

6                    Respectfully submitted,

7

8               By: _____

9                    **STEPHEN YAGMAN**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

  //

31

### DECLARATION OF STEPHEN YAGMAN

I, Stephen Yagman, declare the following to be true under the penalty of perjury, pursuant to 28 U.S.C. 1746, on the date set forth at my signature, below.

1. I am the defendant in *United States v. Yagman*, 06-227-SVW, I am the petitioner/movant herein, and I incorporate herein by this reference the factual matters set forth in the ineffective assistance of counsel section of the foregoing Memorandum, in order to render them admissible in evidence.

2. My appellate counsel, now-Dean Erwin Chemerinsky, has been my friend, both professionally and personally, since at least 1990. It is with great concern and uneasiness that I assert that he was ineffective as my counsel in the appeal in this matter. I stress that this claim is made *only* with respect to the omission of three issues from the Opening Brief on appeal, and not with respect to any other matter, or the Reply Brief, whose first draft I wrote.

3. After the trial in this matter, I had been wiped out financially, owed my trial attorneys over $300,000 (and still owe them that), owed two lawyers in New York City over $50,000 (and still owe them that), owed (and still owe) taxes of approximately $500,000, and could not afford to retain or pay an appellate lawyer. I briefly considered representing myself on appeal, but in the face of both advice from friends and my trial and other counsel not to do that, and because I was too upset and unsettled before and when the Opening Brief was due to research and draft the Opening Brief, and especially to do it while in prison, I told Erwin this, he offered to write it *pro bono*, and I accepted his gracious offer to do so. After I accepted Erwin's offer, he was offered the founding deanship at the new UC Irvine School of Law.

4. One, though not the main, reason I asked for placement at Butner, North Carolina, was that it was located about 20 miles from Duke Law School, at which Erwin then was a tenured law professor. In fact, on March 31, 2008, the day on which I was to report to prison, one of my colleagues, Ben Schonbrun, who has a

32

1  law firm in the same building in which I practiced law, and to whose firm Erwin is

2  of counsel, flew with me to North Carolina, where we met with Erwin briefly, sat

3  in on one of his constitutional law classes, and then I was driven to prison at

4  Butner.

5      5. I had planned to meet with Erwin as often as necessary to have input into

6  the formulation and drafting of the Opening Brief. That never happened.

7      6. As I indicated, I arrived at Butner on March 31, 2008. Erwin visited me

8  for about an hour on or about April 14, but we did not discuss the appeal, as he was

9  not at that time familiar with the record.

10     7. At that meeting, Erwin informed me that he would be going on vacation

11  to Europe during three weeks in June, 2008, and then at the end of June relocating

12  from Durham, North Carolina to Irvine, California. He also told me that this would

13  not interfere with the timely preparation of the Opening Brief on my appeal.

14     8. Erwin never again came to visit me, never wrote to me, and whenever I

15  telephoned him to discuss the Opening Brief, between late June, 2008 and

16  September 2008, when it was filed, I encountered great difficulty reaching him. I

17  wrote to him to ask that he include as issues on appeal issues discussed in the

18  foregoing Memorandum. Some letters are attached hereto. He did not respond.

19  Before he filed the Brief, we never discussed it. I received it only after it was filed,

20  and when I read it I found that it did not contain many issues I believed an

21  effective attorney would have raised.

22     9. I know that beginning in late June, 2008, Erwin became pre-occupied with

23  setting up his new law school, and that he was inattentive to my appeal.

24     10. I am informed that when two other lawyers on my behalf tried to get

25  Erwin to include in the Brief some important issues, including the three that are

26  part of the instant motion, they were rebuffed and invited themselves to write the

27  Brief.

28

33

1    11. I have a number of friends who are highly competent and well-respected
2  lawyers, both in this legal community and on the East Coast, all of whom read the
3  Opening Brief, and all of whom expressed their opinions that it was sub-standard
4  and ineffective. Many of them expressed their shock at reading it. If called upon by
5  the court to do so, I shall endeavor to submit declarations from these attorneys,
6  with a number of whom the court is quite familiar, to further substantiate my claim
7  concerning the Opening Brief. Indeed, my visual inspection of the Brief finds its
8  format and style odd, with even the use of different fonts, as though it had been
9  copied and/or cut and pasted together. I never have drafted a brief that looks like it,
10  and I have drafted perhaps 200 federal appellate opening, reply, and answering
11  briefs, and about 15 certiorari cases and replies, as well as answers to certiorari
12  cases. One of my lawyers mentioned to Erwin that there were no record citations in
13  the Opening Brief, but that lawyer was reprimanded by Erwin for mentioning that
14  to him. When I read the Brief, after it had been filed, I also noticed that there were
15  not record citations in the Opening Brief, and that seemed very unusual to me.

16    12. I was concerned, but there was nothing at all I could do about this, save
17  and except for drafting the Reply Brief, but at that point it simply was too late to
18  raise some issues on appeal.

19    13. Effective counsel would have raised the three issues addressed in the
20  preceding Memorandum, but Erwin didn't raise them.

21    14. One of my trial counsel has informed me that the only point of contact
22  they were able to have with Erwin was with one of his former students at Duke,
23  who identified himself in summer 2008 by his name and "JD '09" after his name,
24  seeming to indicate he was a second year law student, and that the student seemed
25  not to be familiar with any issues on appeal, and asked if he could discuss which
26  appellate claims were meritorious, *etc.* The lawyer responded to him that the
27  lawyer would like to discuss the issues with Erwin, but never heard back, or again,
28  from either the law student or from Erwin.

34

1    15. My sense is that what occurred here is Erwin's first, and very important

2    task during summer 2008 was setting up UC Irvine Law School, which was an

3    enormous undertaking, and that he assigned one of his former law students to go

4    through the voluminous files and trial transcripts and to write a draft of the Brief,

5    probably something the student never before had done. Erwin probably supervised

6    this to some extent. The student didn't understand the record, what had occurred at

7    trial, and was not familiar with the applicable law. The student, for example, I am

8    told didn't understand which witnesses testified and trial, and indicated to one of

9    my other lawyers that he believed that Michael Colello testified at trial, that was

10   incorrect. From my and others' reading of the Brief, it appears that whoever wrote

11   it never read the trial transcript.

12    16. It is my sense of things that during the time Erwin was to have been

13   drafting the Opening Brief, he was preoccupied with setting up his new law school

14   and overburdened with the task of drafting the Brief, was unfamiliar with the trial

15   record, and simply was too busy to do an effective Brief. This can happen to any

16   lawyer. Unbeknownst to Erwin, he good-heartedly had offered to do more than he

17   was capable of doing and became overwhelmed.

18    17. Only three issues were raised on appeal: (1) as to Count Two, whether

19   there was a fraud in furtherance of a larger criminal scheme - this was a losing

20   issue I did not wish to raise, because there would have been no way in which to

21   impeach the jury's finding that the scheme outside the bankruptcy was set forth in

22   Count One, a scheme to evade taxes, and whether there were fraudulent statements

23   or omissions in the bankruptcy case, again an issue on which the jury could not be

24   impeached; (2) whether there was government misconduct, an issue I wished to

25   raise, and that is addressed in a separate Memorandum, submitted concurrently

26   herewith; and (3) the use immunity issue, an issue I wished to raise, and also

27   addressed in a separate Memorandum. Yet, the three issues addressed in the

28   preceding Memorandum, also were important to me.

18.  Attached hereto as exhibits are letters from me to Erwin dated July 11, 2008, August 25, 2008, August 26, 2008, September 8, 2008, with a letter from my very close friend, Fred Friedman, a partner at Jones Day, attached to it, that I sent to Erwin, and a letter from me to Marion R. Yagman, dated August 27, 2008, a copy of which I sent to Erwin, in which I raised the issues set forth in the preceding Memorandum. I never received any response to any of these letters, or to any other letters on this topic.

_____
**STEPHEN YAGMAN**     2/5/2011

36



REOPEN

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
### Bankruptcy Petition #: 99-11958-scc

|  |  |
|---|---|
| | Date filed:   12/28/1999 |
| *Assigned to:* Judge Shelley C. Chapman | Date reopened:   09/05/2006 |
| Chapter 7 | Debtor discharged:   10/13/2000 |
| Voluntary | |
| Asset | |

**Debtor**
**Stephen Yagman**
333 Pearl Street
Apartment 17K
New York, NY 10038
SSN / ITIN: xxx-xx-9430

represented by **Robert R. Leinwand**
Robinson Brog Leinwand
Greene Genovese
& Gluck P.C.
875 Third Avenue
9th Floor
New York, NY 10022
(212) 603-6300
Email: rrl@robinsonbrog.com

**Robert M. Sasloff**
Robinson Brog Leinwand
Greene
Genovese & Gluck P.C.
875 Third Avenue
9th Floor
New York, NY 10022-0123
(212) 586-4050
Fax : (212) 956-2164
Email:
rms@robinsonbrog.com

**Trustee**
**David R. Kittay**
Kittay & Gershfeld, P.C.
100 White Plains Road
2nd Floor
Tarrytown, NY 10591
(914) 332-8000

**U.S. Trustee**
**United States Trustee**
Office of United States Trustee
33 Whitehall Street
21st Floor
New York, NY 10004

(212) 510-0500

| Filing Date | # | Docket Text |
|---|---|---|
| 12/28/1999 | <u>1</u> | Voluntary Petition (Chapter 7). Order for Relief Entered. , *Summary of Schedules, Schedules A Through J, Declaration of Schedules, Statement of Financial Affairs, Statement of Intention, Disclosure of Compensation, Notice to Debtors, Verification of Matrix and Matrix of Stephen Yagman* filed by Robert R. Leinwand of Robinson Brog Leinwand Greene Genovese on behalf of Stephen Yagman. (Leinwand, Robert) (Entered: 12/28/1999) |
| 12/28/1999 | | Receipt of Voluntary Petition Filing Fee (Chapter 7). Receipt Number 102039 (Tetzlaff, Deanna) (Entered: 12/29/1999) |
| 01/05/2000 | | Request for 341(a) Notice with 341(a) meeting to be held on 3/8/2000 at 09:30 AM at 80 Broad St., 2nd Floor, USTM Last day to oppose discharge or dischargeability is 5/8/2000, (Glover, Tara) (Entered: 01/05/2000) |
| 01/05/2000 | | Request for Notice of Electronic Filing Procedures (Glover, Tara) (Entered: 01/05/2000) |
| 01/08/2000 | <u>2</u> | Notice of 341(a) Meeting of Creditors with Certificate of Mailing. Service Date 01/07/00. (Admin.) (Entered: 01/08/2000) |
| 01/08/2000 | <u>3</u> | Notice of Electronic Filing Procedure with Certificate of Mailing. Service Date 01/07/00. (Admin.) (Entered: 01/08/2000) |
| 03/15/2000 | | Notice of Continuance of First Meeting of Creditors on 4/12/2000 at 11:00 AM at 80 Broad St., 2nd Floor, USTM (Kittay, David) (Entered: 03/15/2000) |
| 04/18/2000 | <u>4</u> | Application to Employ *Kittay, Gold & Gershfeld, P.C., as General Counsel to the Trustee Effective April 17, 2000* filed by David R. Kittay of Kittay, Gold & Gershfeld, P.C. on behalf of David R. Kittay. (Kittay, David) (Entered: 04/18/2000) |
| 04/18/2000 | | Notice of Continuance of First Meeting of Creditors on 6/14/2000 at 11:00 AM at 80 Broad St., 2nd Floor, USTM (Kittay, David) (Entered: 04/18/2000) |
| 04/27/2000 | <u>5</u> | Order signed 4/26/00 Granting Application to Employ Kittay, Gold & Gershfeld, PC as General Counsel to the Trustee. (Related Doc # <u>4</u> ) . (Pabon, Carlos) (Entered: 04/27/2000) |
| | | |

| 05/04/2000 | 6 | Order signed 5/3/00 approving stipulation to extend time to object to discharge. (Pabon, Carlos) (Entered: 05/04/2000) |
|---|---|---|
| 06/16/2000 | | Notice of Continuance of First Meeting of Creditors on 7/12/2000 at 11:00 AM at 80 Broad St., 2nd Floor, USTM (Kittay, David) (Entered: 06/16/2000) |
| 07/14/2000 | | Notice of Continuance of First Meeting of Creditors on 8/9/2000 at 11:00 AM at 80 Broad St., 2nd Floor, USTM (Kittay, David) (Entered: 07/14/2000) |
| 08/08/2000 | 7 | Notice of Settlement of an Order filed by Robert M. Sasloff of Robinson Brog Leinwand Greene on behalf of Stephen Yagman. (Attachments: # 1 Proposed Stipulation and Order Withdrawing Exemption and For Related Relief# 2 Affidavit of Service# 3 Service List)(Sasloff, Robert) (Entered: 08/08/2000) |
| 08/14/2000 | | Notice of Continuance of First Meeting of Creditors on 9/13/2000 at 11:00 AM at 80 Broad St., 2nd Floor, USTM (Kittay, David) (Entered: 08/14/2000) |
| 08/16/2000 | 8 | Stipulation and Order signed on 8/15/2000, Withdrawing Exemption and for Related Relief. (related document(s) 7 ) (Richards, Beverly) (Entered: 08/16/2000) |
| 08/23/2000 | 9 | Trustee Report of No Distribution filed by David R. Kittay of Kittay, Gold & Gershfeld, P.C. on behalf of David R. Kittay. (Kittay, David) (Entered: 08/23/2000) |
| 09/18/2000 | | Trustee requests discharge and certifies under FRBP 5009: the estate has been fully administered; I have neither received nor distributed any non-exempt property; I have diligently inquired about the debtor (s) financial affairs and location of estate property. The estate has no nonexempt property to distribute. (Kittay, David) (Entered: 09/18/2000) |
| 10/13/2000 | | Request for Order of Discharge and Order of Final Decree (Richards, Beverly) (Entered: 10/13/2000) |
| 10/16/2000 | 10 | Order of Discharge and Order of Final Decree with Certificate of Mailing. Service Date 10/15/00. (Admin.) (Entered: 10/16/2000) |
| 10/16/2000 | | Case Closed. (Richards, Beverly) (Entered: 10/16/2000) |
| | | Notice of Presentment *and Opportunity for Hearing* filed by Michelle G. Gershfeld on behalf of David R. Kittay. with presentment to be held on 7/24/2006 at 12:00 PM at Courtroom |

| | | |
|---|---|---|
| 06/29/2006 | 11 | 701 (PCB) (Attachments: # 1 Certificate of Service)(Gershfeld, Michelle) (Entered: 06/29/2006) |
| 06/29/2006 | 12 | Motion to Reopen Chapter 7 Case /Application for Order Reopening Case (related document(s) 11 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. Filing fee collected, receipt #635. (Attachments: # 1 Certificate of Service) (Gershfeld, Michelle) (Entered: 06/29/2006) |
| 07/17/2006 | 13 | Objection to Motion for Order Reopening Case or, Request for a Hearing, and for Related Relief (related document(s) 12 ) filed by Robert R. Leinwand on behalf of Stephen Yagman. (Attachments: # 1 Affidavit of Service) (Leinwand, Robert) (Entered: 07/17/2006) |
| 07/18/2006 | 14 | Response /Trustee's Response to Objection to Application for Order Reopening Case (related document(s) 13 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. (Attachments: # 1 Certificate of Service) (Gershfeld, Michelle) (Entered: 07/18/2006) |
| 09/05/2006 | 15 | Order signed on 9/5/2006, Granting Motion to Reopen Chapter 7 Case (Related Doc # 12 ) (Richards, Beverly) (Entered: 09/05/2006) |
| 09/05/2006 | 16 | Blank Notice RE: Order Reopening Case. (Richards, Beverly) (Entered: 09/05/2006) |
| 09/07/2006 | 17 | Certificate of Mailing. (related document(s) (Related Doc # 16 )) . Service Date 09/07/2006. (Admin.) (Entered: 09/08/2006) |
| 09/11/2006 | 18 | Notice of Appointment of Trustee David Kittay (in reopened case) filed by Brian Shoichi Masumoto on behalf of United States Trustee. (Masumoto, Brian) (Entered: 09/11/2006) |
| 09/18/2006 | 19 | Notice of Return Mail re: Notice of Order Reopening Case Sent to Fred Luke (related document(s) 16 ) (White, Greg) (Entered: 09/18/2006) |
| 09/27/2006 | 20 | Letter re: Incorrect Address for Prime Matrix (related document (s) 16 ) filed by Superior Building Products. (White, Greg) (Entered: 09/27/2006) |
| 11/20/2006 | 21 | Ex-Parte Order signed 11/17/06 by Judge Prudence Carter Beatty authorizing Trustee to take necessary action to preserve Estate Assets. (Pabon, Carlos) (Entered: 11/20/2006) |
| | | |

| | | |
|---|---|---|
| 11/21/2006 | 22 | Letter *Objecting to Ex Parte Order Authorizing Trustee to Take Necessary Action to Preserve Estate Assets and Requesting Modification to Order* filed by Lori A. Schwartz on behalf of Stephen Yagman. (Schwartz, Lori) (Entered: 11/21/2006) |
| 01/29/2007 | 23 | Application to Employ Atkinson, Andelson, Loya, Ruud & Romo as Special Counsel *Effective December 12, 2006* filed by Robin Meyer Konigsberg on behalf of David R. Kittay. (Konigsberg, Robin) (Entered: 01/29/2007) |
| 03/01/2007 | 24 | Order signed 3/1/07 by Judge Prudence Carter Beatty granting Application to Employ Atkinson, Andelson, Loya, Ruud & Romo as Special Counsel.(Related Doc # 23 ) signed on 3/1/2007. (Pabon, Carlos) (Entered: 03/01/2007) |
| 03/12/2007 | 25 | Motion for Relief from Stay filed by J. Curtis Edmondson on behalf of Michael Colello. with hearing to be held on 3/16/2007 at 02:00 PM at Courtroom 701 (PCB) (White, Greg) $150.00, Receipt Number 171895. Modified on 3/13/2007 (Porter, Minnie). (Entered: 03/12/2007) |
| 03/12/2007 | 26 | Response to Motion : *Response to Notice of Motion and Motion for Limited Relief from the Bankruptcy Stay* (related document(s) 25 ) filed by Robert R. Leinwand on behalf of Stephen Yagman. with hearing to be held on 3/16/2007 at 02:00 PM at Courtroom 701 (PCB) (Leinwand, Robert) (Entered: 03/12/2007) |
| 03/12/2007 | 27 | Application for Pro Hac Vice Admission filed by Joseph Curtis Edmondson on behalf of Michael Collelo. Filing fee collected, receipt #171887. (Porter, Minnie) (Entered: 03/14/2007) |
| 03/15/2007 | 28 | Order signed 3/15/07 by Judge Prudence Carter Beatty Granting Application for Pro Hac Vice of J. Curtis Edmondson, Esq. (Related Doc # 27 ) (Pabon, Carlos) (Entered: 03/15/2007) |
| 04/02/2007 | 29 | Order signed on 3/30/2007, Granting Motion for Relief from Stay (Related Doc # 25 ) (Richards, Beverly) (Entered: 04/02/2007) |
| 09/10/2007 | 30 | Letter *Requesting Bar Date* filed by Robin Meyer Konigsberg on behalf of David R. Kittay. (Konigsberg, Robin) (Entered: 09/10/2007) |
| 09/11/2007 | 31 | Request for Notice of Possible Dividends. Proof of Claims due by 12/13/2007 (White, Greg) (Entered: 09/11/2007) |
| | | Notice of Possible Dividend with Certificate of Mailing (related document(s) (Related Doc # 31 )) . Service Date 09/13/2007. |

| 09/13/2007 | 32 | (Admin.) (Entered: 09/14/2007) |
|---|---|---|
| 11/04/2009 | 33 | Notice of Presentment *of Order For Bankruptcy Rule 2004 Examination of Marion Yagman, Personally, and in Her Capacity as Business Partner With Stephen Yagman* filed by Michelle G. Gershfeld on behalf of David R. Kittay. with presentment to be held on 11/17/2009 at 12:00 PM at Courtroom 701 (PCB) (Gershfeld, Michelle) (Entered: 11/04/2009) |
| 11/04/2009 | 34 | Application for FRBP 2004 Examination *of Marion Yagman* (related document(s) 33 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. with presentment to be held on 11/17/2009 at 12:00 PM at Courtroom 701 (PCB) (Gershfeld, Michelle) (Entered: 11/04/2009) |
| 11/04/2009 | 35 | Certificate of Service (related document(s) 33 , 34 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. (Gershfeld, Michelle) (Entered: 11/04/2009) |
| 11/04/2009 | 36 | Notice of Presentment *of Order for Bankruptcy Rule 2004 Examination of Karen D. Mattox* filed by Michelle G. Gershfeld on behalf of David R. Kittay. with presentment to be held on 11/17/2009 at 12:00 PM at Courtroom 701 (PCB) (Gershfeld, Michelle) (Entered: 11/04/2009) |
| 11/04/2009 | 37 | Application for FRBP 2004 Examination *of Karen D. Mattox* (related document(s) 36 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. with presentment to be held on 11/17/2009 at 12:00 PM at Courtroom 701 (PCB) (Gershfeld, Michelle) (Entered: 11/04/2009) |
| 11/05/2009 | 38 | Certificate of Service (related document(s) 36 , 37 ) filed by Michelle G. Gershfeld on behalf of David R. Kittay. (Gershfeld, Michelle) (Entered: 11/05/2009) |
| 11/17/2009 | 39 | Order signed 11/17/09 by Judge Prudence Carter Beatty granting application for 2004 Examination of Marion Yagman. (Related Doc # 34 ) (Pabon, Carlos) (Entered: 11/17/2009) |
| 11/17/2009 | 40 | Order signed 11/17/09 by Judge Prudence Carter Beatty granting application for Rule 2004 Examination of Karen D. Mattox. (Related Doc # 37 ) (Pabon, Carlos) (Entered: 11/17/2009) |
| 06/08/2010 | 41 | Letter *providing status update* filed by David R. Kittay on behalf of David R. Kittay. (Kittay, David) (Entered: 06/08/2010) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/05/2011 14:34:56 | | | |
| **PACER Login:** | sy0500 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 99-11958-scc Fil or Ent: filed Doc From: 0 Doc To: 99999999 Format: html |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

EXHIBIT II

1   COURT'S INSTRUCTION NO. _____

2   DEFENDANT'S PROPOSED INSTRUCTION NO. 12

3       In order to prove the offense charged in count two, the government must

4   establish beyond a reasonable doubt that Mr. Yagman devised a scheme to defraud

5   outside of bankruptcy which used bankruptcy as a means of executing or concealing

6   the scheme.

1     *United States v. Milwitt*, 475 F.3d 1150, 1155 (9th Cir. 2007) ("As opposed to

2     the historic bankruptcy crimes, as exemplified in § 152, which concerns acts

3     committed in the bankruptcy context, the focus of § 157 is a fraudulent scheme

4     outside the bankruptcy which uses the bankruptcy as a means of executing or

5     concealing the artifice").



The defendant is charged in Count Two of the First Superseding Indictment with bankruptcy fraud, in violation of Title 18, United States Code, Section 157. Before I instruct you on the elements of bankruptcy fraud, I will give you some instructions on bankruptcy law in general.

A bankruptcy case is initiated by the filing of a bankruptcy petition. The person on whose behalf the bankruptcy petition is filed is called the "debtor." The persons or entities that are owed money or that have a claim against the debtor are called "creditors."

The filing of a bankruptcy case creates the bankruptcy "estate." The bankruptcy "estate" is administered by a court appointed trustee and includes any property of any kind in which the debtor has a legal or equitable interest and, subject only to a few exceptions, includes everything the debtor owns, without regard to value at the time the petition is filed.

Upon filing a bankruptcy petition under Chapter 7 of the bankruptcy code, the debtor has an affirmative obligation to reveal all information regarding his assets as required by the bankruptcy court in its form petition. The estate of the debtor consists of all legal or equitable interests of the debtor in property as of the commencement of the case. However, the estate of the debtor only includes that portion of a contingency fee ultimately realized which was earned prior to the date of the bankruptcy. When that portion of the fee is realized, it must be turned over to the bankruptcy trustee.

The filing of the bankruptcy petition operates to stay or stop any action by creditors on their claims against the debtor or his property, unless permission of the bankruptcy court is first obtained. For instance, a creditor may not commence or continue any judicial or administrative action or proceeding against the debtor; nor may a creditor enforce, against the debtor or the property of his or her estate, a judgment obtained before the petition was filed. A creditor may proceed against the debtor or his property only after requesting and obtaining from the bankruptcy court relief from the stay.

After the filing of a bankruptcy case, the debtor must file with the Bankruptcy Court a list of creditors, a schedule of assets and liabilities, a schedule of current income and expenditures, and a statement of the debtor's financial affairs.

The debtor is also required to submit to questioning under oath by the trustee and/or by creditors regarding his or her property, liabilities and financial condition.

In the schedule of assets, the debtor is required to disclose the existence of any assets belonging to the debtor, including assets in which the debtor has an equitable interest. The fact that legal title to an asset is held by another person or corporation does not relieve the debtor of his or her duty to disclose his or her equitable interest in such an asset.

The debtor is required to disclose all of the information called for by the schedules of assets and the Statement of Financial Affairs. It is the Bankruptcy Court that makes the final determination as to whether or not property is an asset of the estate. The debtor's duty to disclose all assets in

existence at the time the bankruptcy petition is filed continues for the duration of the bankruptcy proceeding and may involve, for example, the filing of amended schedules. A debtor is required to cooperate with the trustee as necessary to enable the trustee to perform his or her duties, which may include providing additional information. This duty continues during the pendency of the bankruptcy case, or under certain circumstances, after the bankruptcy has been concluded (for example, an agreement between the parties)

When a petition is filed under chapter 7 of the bankruptcy code, a trustee is appointed to administer the estate of the debtor. It is the duty of the trustee to collect and sell all the property of the estate (subject to certain exemptions established by statute) in a process known as "liquidation."

The trustee then distributes the money he has obtained through the liquidation to the debtor's creditors.

If the debtor in a Chapter 7 bankruptcy proceeding successfully completes the bankruptcy process, the debtor will, with a few limited exceptions, obtain permanent discharge from most debts that existed at the time the petition was filed. Among the debts dischargeable in bankruptcy are federal and state income taxes, subject to the following three conditions:

(1) such taxes must be due and owing, and the tax returns for such taxes must be required to have been filed, in excess of three years prior to the date of the filing of the bankruptcy petition;

(2) such taxes must be finally assessed by the proper governmental agency in excess of 240 days prior to the date of the filing of the bankruptcy petition; and

(3) the tax returns for such taxes must have been filed in excess of two years prior to the date of filing of the bankruptcy petition.

An equitable interest in property exists where a debtor fraudulently conveys it to a third-party. To establish this fact against Defendant, the government must prove all of the following:

(1) That Defendant's creditors had a right to payment of some debt owed by Defendant;

(2) That Defendant transferred the Venice residence to K.D. Mattox;

(3) That Defendant transferred the Venice residence with the intent to hinder, delay, or defraud one or more of his creditors;

(4) That the creditors were harmed; and

(5) That Defendant's conduct was a substantial factor in causing the creditors harm.

To prove intent to hinder, delay, or defraud creditors, it is not necessary to show that Defendant had a desire to harm his creditors. The government need only show that Defendant intended to remove or conceal assets to make it more difficult for his creditors to collect payment.

In determining whether Defendant intended to hinder, delay, or defraud any creditors by transferring the Venice residence to K.D. Mattox, you may consider, among other factors, the following:

    (a) Whether the transfer was to a close acquaintance;

    (b) Whether Defendant retained possession or control of the property after it was transferred;

    (c) Whether the transfer was disclosed or concealed;

    (d) Whether before the transfer was made Defendant had been sued or threatened with suit;

    (e) Whether the transfer was of substantially all of Defendant's assets;

    (f) Whether Defendant fled;

    (g) Whether Defendant removed or concealed assets;

    (h) Whether the value received by Defendant was not reasonably equivalent to the value of the asset transferred;

    (i) Whether Defendant was insolvent, meaning his debts exceeded his assets, or became insolvent shortly after the transfer;

    (j) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

Evidence of one or more factors does not automatically require a finding that Defendant acted with the intent to hinder, delay, or defraud creditors. The presence of one or more of these factors is evidence that may suggest the intent to delay, hinder, or defraud.

A quitclaim deed transfers to the grantee all of the right, title and interest that the grantor had at the time the deed was executed and delivered.  It transfers whatever interest the grantor may have in the property, whether legal or equitable, and is as effective as any other form of conveyance to transfer the grantor's title to the grantee.  A grantor may retain an equitable interest, however, if the transfer was fraudulent as defined in these instructions.

The defendant is charged in Count Two of the First Superseding Indictment with bankruptcy fraud, in violation of Title 18, United States Code, Section 157. This statute provides in pertinent part as follows:

> A person who, having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so –
>
> (1) files a petition pursuant to the bankruptcy laws; or
> (2) files a document in a proceeding pursuant to the bankruptcy laws; or
> (3) makes a false or fraudulent representation, claim, or promise concerning or in relation to a bankruptcy proceeding, at any time before or after the filing of the petition, or in relation to a proceeding falsely asserted to be pending under such title,

shall be guilty of an offense against the United States.

In order for the defendant to be found guilty of bankruptcy fraud in violation of Title 18, United States Code, Section 157, the government must prove each of the following elements beyond a reasonable doubt:

> First, defendant engaged in a scheme to defraud;

> Second, defendant (1) filed a document in connection with a bankruptcy proceeding; or (2) made fraudulent misrepresentations, omissions, claims and promises concerning and in relation to a bankruptcy proceeding; and

> Third, in performing these acts, defendant acted with the intent to defraud his creditors. It does not matter whether a creditor was defrauded in fact. An intent to defraud is an intent to deceive or cheat.

It does not matter whether the document filed in connection with the bankruptcy petitions was itself false or deceptive. In addition, it does not matter whether the documents filed or the misrepresentations or omissions achieved their intended purpose, nor does it matter whether the scheme was successful, so long as these actions were taken for the purpose of executing or attempting to execute the scheme. An unsuccessful scheme to defraud is as illegal as a scheme or plan that is ultimately successful.

Count Two of the First Superseding Indictment charges defendant with executing and attempting to execute the bankruptcy fraud scheme by committing the following acts:

(1) On or about June 28, 2000, defendant YAGMAN submitted and caused to be submitted to the bankruptcy trustee in connection with a proceeding under Title 11, the case of "In re Stephen Yagman, Debtor," Case No. 99-11958-PCB, a summary of cases in which he omitted cases in which he had an economic interest at the time he filed his personal bankruptcy petition.

(2) On or about July 14, 2000, defendant YAGMAN submitted and caused to be submitted to the bankruptcy trustee in connection with a proceeding under Title 11, the case of "In re Stephen Yagman, Debtor," Case No. 99-11958-PCB, a summary of cases in which he omitted cases in which he had an economic interest at the time he filed his personal bankruptcy petition.

(3) On or about April 22, 2002, defendant YAGMAN filed and caused to be filed an opposition to the bankruptcy trustee's motion to dismiss bankruptcy in connection with a proceeding under Title 11, the case of "In re Yagman & Yagman, P.C.," Case No. 99-50138-ER.

You need not find that all three acts were committed. In order to find the defendant guilty, you must find that the defendant committed one or more of the three acts that are alleged, for the purpose of executing such scheme. You must also unanimously agree on which specific act or acts the defendant committed.

Additionally, in order to find Defendant guilty of the first two acts of execution, as listed in the Special Verdict Form, you must also unanimously find by a preponderance of the evidence that a particular act of execution was begun, continued, or completed within the Central District of California, which includes Los Angeles County. Preponderance of the evidence means that you must be persuaded by the evidence that the claim is more probably true than not true.

The defendant's commission of act number three need not contain false or inaccurate misrepresentations. All that is required is proof beyond a reasonable doubt that the defendant's commission of this act in some manner furthered, or advanced, or was used to carry out the scheme to defraud.

Counts Three through Nineteen of the First Superseding Indictment each charge defendant with engaging in monetary transactions with property derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957. This statute provides in pertinent part:

> Whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity . . .

shall be guilty of an offense against the United States.

In order for the defendant to be found guilty of engaging in monetary transactions in property derived from specified unlawful activity, the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly engaged in or attempted to engage in a monetary transaction;

Second, the defendant knew the transaction involved criminally derived property;

Third, the property had a value of greater than $10,000;

Fourth, that the property was, in fact, derived from a specified unlawful activity, namely, making false oaths and claims and the concealment of assets in bankruptcy, in violation of Title 18, United States Code, Section 152.

Fifth, the transaction occurred in the United States.

With respect to Counts Three through Nineteen, an act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

As used in Title 18, United States Code, Section 1957:

> (1) the term "monetary transaction" means the deposit, withdrawal, transfer, exchange, in or affecting interstate commerce, of funds or a monetary instrument (to include currency of the United States, personal checks, and bank checks) by, through or to a financial institution which is engaged in, or the activities of which affect interstate or foreign commerce in any way or degree.

> (2) the term "financial institution" means an insured bank of the Federal Deposit Insurance Act, a commercial bank or trust company, or a broker or dealer in securities or commodities.

> (3) the term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense, that is, a prior, separate criminal activity.

The government must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The government does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of a violation of Title 18, United States Code, Section 152, namely, making false oaths and claims and the concealment of assets in bankruptcy.

Although the government must prove that, of the property at issue in each count of the indictment charging a violation of section 1957, more than $10,000 was criminally derived, the government does not have to prove that all of the property at issue was criminally derived.

To establish a violation of § 1957 based on a withdrawal or transfer of funds, the government must prove beyond a reasonable doubt either:

1. That all of the money in the account at the time a particular withdrawal or transfer was made was criminally derived; or

2. That the amount of a particular withdrawal or transfer exceeded the total of all noncriminally derived funds in the account just prior to the withdrawal. For example, if the account contained $100,000, of which half was criminally derived and half was not, any withdrawal of less than half of the funds in the account - that is less than $50,000 - would not involve criminally derived property. In this situation, remember that the government must prove that the withdrawal or transfer included more than $10,000 of criminally derived funds.

With respect to each of the monetary transactions charged in counts Three through Nineteen of the First Superseding Indictment, the government must prove that the funds involved in those transactions were derived from the defendant's concealment of assets in bankruptcy, in violation of Title 18, United States Code, Section 152(1), or false statement under oath in a bankruptcy proceeding, in violation of Title 18, United States Code, Section 152(2).

In order to establish a fraudulent concealment in violation of 18 U.S.C. § 152(1), the government must prove each of the following essential elements beyond a reasonable doubt:
    (1) There existed a proceeding in bankruptcy;
    (2) Certain property or assets belonged to the bankrupt estate;
    (3) Defendant concealed this property from the creditors or from the trustee in bankruptcy; and
    (4) The defendant acted knowingly and fraudulently.

In order to establish a false oath in violation of 18 U.S.C. § 152(2), the government must prove each of the following elements beyond a reasonable doubt:
    (1) There existed a proceeding in bankruptcy;
    (2) The defendant made a statement under oath in or in relation to that case;
    (3) The statement related to a material matter; and
    (4) The defendant acted knowingly and fraudulently in making the statement.

The government must prove that the funds involved in each of the monetary transactions charged in counts Three through Nineteen of the First Superseding Indictment were derived from a violation of Title 18, United States Code, Section 152(1) or 152(2), that is, from defendant's knowingly and fraudulently concealing property that belonged to the estate of the debtor from the trustee of the bankruptcy court or creditors, or knowingly and fraudulently making a false statement under oath as to a material matter in or in relation to a bankruptcy petition. A statement is material if it has a natural tendency to influence or is capable of affecting or influencing the person to whom it is directed.

It is not necessary for the government to prove that any creditor, trustee, or bankruptcy court actually relied upon the false statement. Nor is it necessary for the government to prove that anyone was harmed by or suffered any loss as a result of the false statement.

"Proceeds" includes money, tangible assets, or things of value.



July 11, 2008 ████████████████

Dear Erwin:

Here are a few thoughts about my appeal:

1. It seems that a main point would be that I was charged under the incorrect bankruptcy statute, having been charged under 18 U.S.C. 157, when the correct statute appears to me to have been section 152. Mark Heaney picked up on this point and a motion was made. The important difference is that section 152 criminalizes making a false or misleading statement or leaving something off a bankruptcy *petition*, whereas section 157 criminalizes the same conduct, but in a bankruptcy *proceeding*. This is important because the petition is the first pleading in the bankruptcy *case*, often, but incorrectly used interchangeably with a bankruptcy *proceeding*, but in bankruptcy both words are terms of art, and "proceeding" has a unique meaning in bankruptcy, to wit, it is a case within the bankruptcy case, such as one that might have been pending against or by the petitioner that then gets litigated within the bankruptcy *case*.

I think the reason they charged me under the wrong statute is that since the *case* was filed, by filing the petition in New York, they would have had to charge me under section 152 only in New York, they didn't want to do that for tactical reasons, so they charged me under section 157, under which they could lay venue in Los Angeles.

The importance of this is that there never was any bankruptcy *proceeding*, the only charges against me were making misstatements in the bankruptcy *case*, yet I was convicted under section 157. Mark laid out all this in a motion, and it seems to me to be important.

2. Second, under the very recent *Santos* case from the Supreme Court, that I've read and analyzed, it seems that, as to the money laundering counts against me, since the Court now has narrowed the money laundering statute so that there may be money laundering only when an allegedly improper financial transaction is done with "profits," as opposed to "proceeds," since none of the transactions charged against me either alleged or was in or was proved to be in a "profit," therefore, all the money laundering counts should fall.

3.  Were either the bankruptcy and/or the laundering convictions to fall, it would appear that, and as the record shows, since so much of the evidence against me addressed those charges, that the jury would have been so prejudiced against me that the reversal of the attempted tax evasion charges might be warranted. (I remain confused as to what I actually was convicted of as to the tax count: tax evasion or attempted tax evasion.)



...hing else, I shall let you know.



Regards,

STEPHEN

08/25/08

Dear Erwin:

I assume you received my various notes re: appeal, and (hope) you will include the two issues of (1) money laundering, in light of the Court's 06/08 Santos opinion, and (2) charging the BK under §157 instead of §152, if viable.

When you send the brief to me, please do not bind it, and just put a clip on it, so I may copy it easily.

Please send FedEx as follows:

STEPHEN YAGMAN
CAMP
BOX 1000
Butner, NC 27509

Also, please send me a copy of the bail motion, that I hope will not go to the same panel. Hopefully, you will not entitle it "renewed" motion.

Thanks so much.

Stephen

08/26/08

Dear Erwin:

One final thought on my appeal:

It seems that if the contention that I was charged improperly for bankruptcy fraud under 18 USC 1957(2) is correct, which I believe it is, that then, since part of the basis for the attempted tax evasion is "committing bankruptcy fraud," see attached page 8, #12, of the pre-sentence report (and the indictment), therefore the tax charge must fall, at least since there is no way to know on which of the potential three predicates ([a] - [c]) the jury convicted me. Thanks

Stephen

Also, the potential prejudice of the bankruptcy charge may undercut the viability of the tax charge.

September 8, 2008

Dear Erwin:

Here's my take, for what it might be worth, on the recent Ninth Circuit decision in *United States of America v. Straub*, 07-30182 (9th Cir. 08/15/08), and how it is implicated in my appeal.

[W]e find that our precedents lead to the conclusion that a showing of effects is sufficient [to show error] . . . .

The first prong . . . [of the] test is that "the witness's testimony would have been relevant." [Citation omitted.] We have described the relevance requirement for purposes of the . . . test as "minimal." [Citation omitted.] The defendant "need not show that the testimony sought [under a grant of use immunity] was either clearly exculpatory or essential to the defense." [Citation omitted.] . . . [T]estimony [is] relevant because it raised credibility questions about a key prosecution witness. . . . [If sought] testimony would have given the defense some additional ammunition in attacking credibility [of another witness it is relevant].

The second prong [of the] test is that "the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process." [Citation omitted.] . . . [T]he defendant may satisfy this prong by showing "that the prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination." [Citation omitted.]

*Id.*, slip op. at 10699-700.

1

Based on the above quotation, here is what I might say:

In the instant case, under *Straub*, the "showing of effects" test is met. Its first prong, that the witnesses' testimony would have been relevant is satisfied both because witnesses Marion R. Yagman's (one of Mr. Yagman's law partner) and K.D. Mattox (Mr. Yagman's spouse) had intimate knowledge of Mr. Yagman's financial affairs and what he had said to them about those affairs over a period of nearly 20 years and would have been clearly exculpatory and was essential to Mr. Yagman's defense.

Ms. Yagman did all of the tax preparation work for the Yagman law firm and acted as a conduit for the transmission of Mr. Yagman's tax information each year to the firm's and Mr. Yagman's tax accountant, Aaron Zimmer, of Singer & Co. Ms. Yagman was in charge of all firm tax-related matters, including the withholding taxes with whose non-payment Mr. Yagman was charged, and which Ms. Yagman paid. Ms. Yagman also knew all of the details of how the firm functioned, for she ran the business end of the firm, and knew how firm files were kept, and had intimate knowledge – that would have corroborated Mr. Yagman's testimony – about cases whose names Mr. Yagman was accused of not listing on his personal bankruptcy petition. Ms. Yagman's testimony was essential to Mr. Yagman's defense.

Similarly, Ms. Mattox' testimony was essential to Mr. Yagman's defense. Ms. Mattox (1) was Mr. Yagman's significant other and lived together with him from 1991 onward, and they were married, in Aspen, Colorado on January 24, 2005; (2) Mr. Yagman did not have a personal bank account, and all of the expenses and business having to do with the common residence was carried on through Ms. Mattox' checking accounts, the house accounts, into which Mr. Yagman deposited all of his earnings from 1991 to 2008; (3) Mr. Yagman made a gift of the home he

2

had purchased with Ms. Yagman in April 1989 to Ms. Mattox in December 1995, and Ms. Mattox had intimate details concerning that transaction, a home in which Mr. Yagman and Ms. Mattox shared from 1991 to 2008.

Both Ms. Yagman and Ms. Mattox would have made excellent witnesses for Mr. Yagman and would have corroborated everything to which he testified. Ms. Yagman is a *magna cum laude* graduate of Barnard College, a graduate of Southwestern University School of Law, and has been a practicing lawyer for 30 years. Ms. Mattox received both a bachelor's degree and a master's degree in social science from Florida State University and for many years was a successful advertising and magazine executive. Both make excellent appearances and are intelligent, mature, and credible. Mr. Yagman's relationships with both of them demonstrate his good judgment, stability, loyalty, and credibility. There would be no doubt that a prosecutor, much less any attorney, would want to keep off the witness stand in any case involving Mr. Yagman these two witnesses for him. Their testimony would have given Mr. Yagman "some additional ammunition in attacking credibility "of other witnesses against Mr. Yagman.

*Straub's* second prong is met because the prosecution refused to grant immunity to both Ms. Yagman and Ms. Mattox with the deliberate intention of distorting the fact-finding process, and it is shown that the prosecution intentionally caused both witnesses to invoke the self-incrimination clause by engaging in the following conduct: (1) Ms. Yagman was told she was a person of interest by the prosecution who then hauled Ms. Yagman before the grand jury and subpoenaed materials from her, she appeared and answered some questions, but ultimately invoked the self-incrimination clause, and thereafter she was told she was a target of the investigation; (2) the prosecution advised Ms. Yagman's counsel, Donald Re, that the Tax Division at main Justice had authorized the indictment of Ms. Yagman, who ultimately was not

3

indicted; (3) Ms. Mattox was told she was a target of the investigation and did not appear before the grand jury; (4) the prosecution advised Ms. Mattox' lawyers, Frederick D. Friedman of Jones Day and Victor Sherman of Sherman & Sherman, that the Tax Division of main Justice had authorized the indictment of Ms. Mattox, who ultimately was not indicted; (5) the government filed a civil forfeiture action against Ms. Mattox' home; (6) no statute of limitations as to potential criminal charges against either Ms. Yagman or Ms. Mattox has run out.

Thus, it is clear that the prosecution, from early on, sought to neutralize both Ms. Yagman and Ms. Mattox, never to indict them, but improperly to prevent them from testifying in Mr. Yagman's behalf. The prosecution intentionally caused both Ms. Yagman and Ms. Mattox to invoke the self-incrimination clause, which both did, and thereby prevented Mr. Yagman from having the enormous benefit of these two very knowledgeable and credible witnesses. This clearly is an error that permeates all charges against Mr. Yagman.

****

I hope this is of some assistance. Also, enclosed is a letter I got from Fred, whose comments on bail may be helpful.

Thanks so much for your support.



Regards,

STEPHEN

4

August 27, 2008

Dear Marion:

Here is the reason the bail motion is so important to me, and needs to be made when the appeal brief is filed: it could result in my not serving any more time in prison and in every additional day I spend here being a day I otherwise would not have had to spend here. This should be self-evident.

The standard for granting bail on appeal is that "significant issues are raised on appeal, so that, if they are successful, the sentence imposed will be wiped out or be lower."

The original bail motion was denied because, at that time, the identification of issues was sketchy and not very persuasive. Now, the actual issues will be laid out persuasively argued in the brief.

(1) They charged me under the wrong bankruptcy statute to be able to lay venue in L.A., as opposed to in N.Y. If the charge had been under the correct statute, section 152, basic bankruptcy fraud (in the petition), venue only could have been laid in New York. Under the statute with which they charged me, section 157(2), the only applicability is to a bankruptcy "proceeding." "Proceeding" is a term of art that does *not* apply to the entire bankruptcy "case," that is initiated by the bankruptcy petition, but instead refers only to "proceedings" *within* the bankruptcy "case," such as ones brought there from a state court, in which the debtor was a party. It's like the "play within the play" in *Hamlet*, in which Hamlet puts on the play for his mother and her new husband, who murdered his father. There was no bankruptcy *proceeding* in my bankruptcy case – there was only the actual case, and thus, I was charged and convicted under the wrong statute, and this should result in reversal. It is very basic federal criminal law that when a

defendant is charged under an incorrect statute, the conviction cannot stand.

Thus, there is a fair probability that the conviction under Section 157(2) will not stand on appeal.

(2) The June 12, 2008 Supreme Court *Santos* case should result in reversal of all the 11 money laundering counts because now money laundering cannot be based on the transfer of "proceeds," but must be based on the a transfer of "profits," and in my case it was not alleged or proved there were any "profits." It was charged only that there were post-tax liability transfers of more than $10,000, but without any contention or proof that any of the transfers was of "profit," the convictions cannot stand.

(3) Since one of the three alleged bases for the attempted tax evasion charge was the bankruptcy fraud, if the bankruptcy count were thrown out, because it cannot be ascertained on which of the three bases the jury found guilt, therefore, the tax charge would be thrown out.

Hence, there are many bases on which to argue there would be a lower sentence.

I've been able to figure out, ███████████████████ ████████████ who is expert in figuring out sentencing levels and sentencing, that if just the money laundering were thrown out, my sentence would go from level 27, which resulted in my 36-month sentence, to level 12, which would result in a sentence of 10-16 months. Taking into account the six months I already will have served by the end of September, and deducting it from the 10-16 months, the time left would be 4-10 months, with the last six months in a half way house in L.A., from which they release you in a week or two, if you get a job.

This is why the bail motion is so important. I would get out on bail immediately and then, depending on the eventual outcome of the appeal, could end up not having to serve any additional time. Thus, the sooner the bail motion is made, the more chance there is whatever incarceration I had until then would be all the incarceration I would have to serve.

I know Mark Heaney (who understands sentencing and who argued the calculations at my sentencing)((310-545-6774) can explain this, or write it up, because I believe that Erwin, like me, cannot explain how the throwing out of various charges would result in a lesser sentence. *I think that it would need to be explained in the bail motion just how any reduction in the sentence would be computed, given the at least three various scenarios.* (If Mark can't quickly be found – perhaps he might be on vacation, then perhaps Mi Kim or Victor Sherman, or Fred Friedman, could provide the necessary explanation. I am unable to quite put it together, and I would not have confidence I would be correct, as the government obviously will challenge whatever would be said.)

Mark *(or someone) needs to provide an explanation of how, in each instance, were there success, the sentence would go down.*

STEPHEN

c: Erwin