1  STEPHEN YAGMAN
   723 Ocean Front Walk
2  Venice, California 90291-3212
   (310) 452-3200
3
4  Attorney for Stephen Yagman

FILED
CLERK, U.S. DISTRICT COURT
MAY 11 2011
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

RECEIVED,
BUT
NOT FILED
**ORIGINAL**
FEB - 7 2011
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN YAGMAN,<br><br>Petitioner-Movant. | No. CV-10-9033-SVW<br>(CR-06-227-SVW)<br><br>**SUBMISSION 4 OF 4[*]:**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF 28 U.S.C. § 2255 PETITION AS TO ISSUE OF VINDICTIVE/SELECTIVE PROSECUTION, BASED IN PART ON NEWLY-DISCOVERED EVIDENCE**<br>(02-07-11)<br><br>Judge Stephen V. Wilson |

Stephen Yagman submits the following Memorandum of Points and Authorities in support of his November 4, 2010, 28 U.S.C. § 2255 habeas corpus petition.

By: _Stephen Yagman_
   **STEPHEN YAGMAN**

_____

[*] Four, separate submissions are made: (1) submission 1, on all issues, except vindictive/selective prosecution (under seal); (2) submission 2, on vindictive/selective prosecution (under seal); (3) exhibits (under seal); and (4) (this submission) only on legal authorities bearing on vindictive/selective prosecution (not under seal).

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1. INTRODUCTION

The investigation was initiated and convened following, and in retaliation for, Stephen Yagman being appointed as Special Prosecutor for the State of Idaho in connection with the notorious Ruby Ridge Massacre. The investigation was intensified immediately following, and in retaliation for, Mr. Yagman's successful *en banc* Ninth Circuit decision on June 5, 2001, in which, for the first time in American legal history, a state was permitted to bring criminal charges against a federal law enforcement agent, here the FBI. *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir.) (*en banc*), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) (denying sovereign immunity).

The June 5, 2001[1] date is extremely important because IRS Agent Charles Mullaly, the IRS investigating agent in Mr. Yagman's case, stated in a sworn declaration dated November 5, 2004, Exhibit 10, that "[i]n approximately June 2001, the Internal Revenue Service ("IRS"), Criminal Investigation Division ("CID"), commenced a criminal tax investigation of Mr. Yagman after receiving information from an anonymous confidential informant[,]" and on December 7, 2006, Mullaly's supervisor in 2001, Peter Alvarado, stated in a sworn declaration that the tip to which Mullaly had referred in his 2004 declaration in fact was received on April 16, 2001 (which Mr. Yagman did not know), and Alvarado later

---

[1] From November 12, 1997 until June 5, 2001, defendant FBI sniper Lon T. Horiuchi's nine government-paid lawyers always treated Mr. Yagman as though he were a joke, and never took seriously the prosecution, but once the Ninth Circuit cleared the final hurdle for the prosecution to go forward, the defense's Pollyannaish attitude for the first time turned to genuine concern that, indeed, Mr. Yagman would bring Horiuchi to trial, and that was a serious matter indeed. So, one way, or another, Mr. Yagman would need to be neutralized. The investigation of Mr. Yagman was one way to accomplish that goal.

1  testified under oath in open court, again that the tip to which Mullaly had referred
2  in his 2004 declaration in fact was received on April 16, 2001 (when Mr. Yagman
3  still did not know this), and attached to his declaration was a note he said he had
4  written on April 16, 2001, to memorialize the receipt of that tip. Alvarado also
5  testified that he began the investigation immediately after his receipt of that tip.
6  Thus, both when Alvarado put in his declaration and also when he testified in
7  court that the tip was received on April 16, 2001, Mr. Yagman did not know that
8  and did not have Mullaly's declaration that contradicted what Alvarado twice said
9  with respect to the April 16, 2001 date.

10      The note Alvarado produced was not on any IRS or government form, and
11  he never produced the original of it.

12      The reason for the great significance of this discrepancy in dates is that,
13  once the government surmised that Mr. Yagman would contend that his successful
14  Ruby Ridge Ninth Circuit decision on June 5, 2001 triggered the investigation of
15  him, it sought, through the ruse of Alvarado's declaration and the odd note
16  attached to it, and his subsequent courtroom testimony, to push back in time as far
17  as it could the date on which it would claim the investigation of Mr. Yagman had
18  begun. Any oddity is that by the time Mr. Yagman questioned this odd
19  configuration of dates in late 2006 and wanted to question Robert Solorio, the IRS
20  agent whom Alvarado said he assigned to investigate Mr. Yagman, and who had
21  no experience in bankruptcy investigations or investigations of lawyers, Solorio
22  mysteriously had retired to Mexico, and the government contended they could not
23  locate him, notwithstanding the government was sending pension payments to
24  him. Though Mr. Yagman got to question Alvarado, the government resisted
25  producing Solorio, never produced him for questioning, and Mr. Yagman never
26  got to question Solorio.
27
28

3

Then, on January 19, 2002, Mr. Yagman brought the first Guantanamo Bay habeas case, *Coalition of Clergy, Lawyers & Professors v. George Walker Bush & Donald Rumsfeld*, 189 F.Supp. 2d 1036 (C.D. Cal. 2002), 310 F.3d 1153 (9th Cir. 2002), *cert. denied*, 123 S.Ct. 2073 (2003), and brought and won the second Guantanamo Bay case, *Gherebi v. George Walker Bush & Donald Rumsfeld*, 262 F.Supp. 1064 (C.D. Cal. 2003), 352 F.3d 1278 (9th Cir 2003), *stay issued, Bush v. Gherebi*, 124 S.Ct. 1197 (2004), *cert. granted, vacated and remanded*, 542 U.S. 952 (2004), *reinstated*, 374 F.3d 727 (9th Cir. 2004), *on remand*, 338 F.Supp. 2d 91 (D.C.D. 2004), 355 F.Supp. 2d 443 (D.D.C. 2005) (upholding rights of detainees to due process under Fifth Amendment and right under the Geneva Conventions). Mr. Yagman also continued to prosecute Gherebi's *Bivens* action against government officials and agents. This heightened the government's motivation to get Mr. Yagman.

On March 23, 2006, Mr. Yagman was indicted, and a First Superseding Indictment was filed June 1, 2006 and unsealed on June 23, 2006.

Ironically, the acting U.S. Attorney in Los Angeles, who righteously refused Mr. Yagman's offer to plead guilty to a misdemeanor, in order to try to protect Mr. Yagman's law license, and who in September, 2007 was appointed United States Attorney, Thomas Peter O'Brien, while all this was going on, stole money from the federal government by over-billing it for pricey hotel rooms in which he stayed while visiting Anaheim, California and other places to give public talks, and then lied about it to investigators from the Justice Department's Inspector General's Office. In their official, November, 2010 report, the Inspector General held that Mr. O'Brien's explanations were not "credible or persuasive" when he tried to blame his lies on his secretary, and found his unethical conduct to be

1  "inappropriate and egregious."[1] Of course, Mr. O'Brien was not prosecuted, but

2  charges against him are pending with the California State Bar.[2]

3      This retaliation presents a classic case of vindictive prosecution which

4  violates the Constitution. The law is clear that the necessary remedy is a dismissal

5  of the charges against Mr. Yagman.

6      The government's action presents a serious threat to the constitutional rights

7  of all attorneys and to the adversarial system of justice. If the government can use

8  its awesome powers to investigate and to indict lawyers in retaliation for their

9  advocacy[3], and there is a long history of this in America, *viz.*, Clarence Darrow,

10 Vincent Hallinan, Charles Garry, William Moses Kuntsler, Leonard Weinglass, to

11 name just a few, attorneys will be chilled in representing their clients and in

12 challenging the unconstitutional acts of the United States government. Mr.

13 Yagman was singled out for investigation and prosecution because of who he is

14 and his very aggressive lawyering against the federal government and its officers.

15 (So long as he directed his civil rights prosecutions against local, county, and

16 state, and not against federal, government officers, no one thought of investigating

17

18 _____

19 [1] *See* Wikipedia, "Thomas P. O'Brien," (last accessed 2/6/2011), Exhibit 1;
   "Former U.S. Atty. O'Brien stayed at pricey hotels, blamed secretary, report

20 claims," Los Angeles *Times*, November 11, 2010; "Former U.S. attorney for L.A.

21 criticized for his travel expense," Los Angeles *Times*, November 12, 2010,
   collectively, Exhibit 2 hereto.

22

23 [2] *See* "Formal Ethics Complaint to the State Bar of California against Former U.S.

24 Attorney Thomas P. O'Brien." Exhibit 3 hereto.

25 [3] Contrary to popular belief, that Shakespeare's much-quoted aphorism, "First
   thing we do, let's kill all the lawyers!," by Dick the butcher, was a screed against

26 lawyers, on the contrary it was a recognition that tyrants kill lawyers because

27 lawyers are the only persons who would stand up against tyranny on behalf of the

28 people, *Henry VI*, Part 2, Act 4, Scene 2, pp. 71-78, and if gotten rid of, tyrants
   would be free to do whatever they wanted to do.

1   and prosecuting him. Such truly malicious prosecution strikes at the very heart of a

2   fair justice system.

3       (The facts of the investigation and prosecution are set forth in a separate

4   Memorandum, submission 2, filed concurrently herewith, under seal.)

5

6   **THE CONVICTIONS SHOULD BE DISMISSED BECAUSE THEY ARE A**
              **RESULT OF VINDICTIVE/SELECTIVE PROSECUTION.**

7

8       A basic and well-established constitutional principle is that vindictive

9   prosecutions violate due process of law. *Moran v. Burbine*, 475 U.S. 412, 466

10  (1986) (citing *Brady v. Maryland*, 373 U.S. 83, 87 [1963]); *Bordenkircher v.*

11  *Hayes*, 434 U.S. 357, 363-63 (1978). The Supreme Court has explained that the

12  right a defendant asserts via a vindictive prosecution claim is the "right not to be

13  haled into court" on the charge. *Blackedge v. Perry*, 417 U.S. 21, 30 (1974). The

14  very initiation of proceedings arising from vindictive prosecution denies a

15  defendant due process of law. Id. at 31. Vindictive prosecutions are a profound

16  abuse of government power and punish individuals for the exercise of their

17  constitutional rights.

18      Vindictive prosecutions occur when the government "penalizes a person

19  merely because he has exercised a protected statutory or constitutional right."

20  *Territory of Guam v. Fegurgur*, 800 F.2d 1470, 1472 (9th Cir. 1986). "Vindictive

21  prosecution occurs when a prosecutor 'brings additional charges solely to punish

22  the defendant for exercising a constitutional or statutory right,' such as a criminal

23  defendant's right to a jury trial. *United States v. Noushfar*, 78 F.3d 1442, 1446 (9th

24  Cir. 1996)." *United States v. VanDoren*, 182 F.3d 1077, 1082 (9th Cir. 1999). That

25  is exactly what has occurred in the instant case, as the government began its

26  investigation of Mr. Yagman in response to his exercising his First Amendment

27  rights by serving as a Special Prosecutor in the Ruby Ridge massacre and by suing

28

1   on behalf of Guantanamo Bay detainees. *See NAACP v. Button*, 371 U.S. 415, 434

2   (1963) (advocacy by an attorney is protected by the First Amendment).

3       The law is clear that "the mere filing of an indictment can support a charge

4   of vindictive prosecution." *United States v. Hooton*, 662 F.2d 628, 634 (9th Cir.

5   1981). The appropriate and necessary remedy for vindictive prosecution is the

6   dismissal of criminal charges. *See, e.g., United States v. Loud Hawk*, 474 U.S. 302,

7   309 (1986); *United States v. Ross*, 372 F.3d 1097, 1112 (9th Cir. 2004); *United*

8   *States v. Hernandez*, 80 F.3d 1253, 1261 (9th Cir. 1996); *United States v. Montoya*,

9   45 F.3d 1286, 1300 (9th Cir. 1995). Indeed, there is no other possible remedy

10  available to a criminal defendant who is convicted as a result of malicious

11  prosecution.

12      It is well-established that "a prima facie case for vindictive prosecution

13  requires that the defendant 'prove an improper prosecutorial motive through

14  objective evidence before any presumption of vindictiveness attaches." *United*

15  *States v. Alexander*, 287 F.3d 811, 818 (9th Cir. 2002) (quoting *United States v.*

16  *Montoya*, 45 F.3d 1286, 1299 [9th Cir. 1995]). However, on a motion to dismiss

17  based on vindictive prosecution, the defendant need only make an initial showing

18  of an "appearance of vindictiveness." *United States v. Burt*, 619 F.2d 831, 836 (9th

19  Cir. 1980) ("The defendant does not have to demonstrate that the prosecution in

20  fact acted with a malicious or retaliatory motive. Instead, once the defendant has

21  made this prima facie showing, then vindictiveness may be inferred." [Citations

22  omitted.]). Once vindictiveness has been inferred, then the burden shifts to the

23  prosecution to rebut the presumption. *Ibid.* Upon such a showing, the prosecution

24  has the burden proving that "independent reasons or intervening circumstances

25  dispel the appearance of vindictiveness and justify its [prosecutorial] decisions.

26  *Montoya*, 45 F.3d at 1299 (quoting *United States v. Hooton*, 662 F.2d 628, 634

27

28

1   [9th Cir. 1981]), *cert. denied*, 455 U.S. 1004 [1982]); *Adamson v. Ricketts*, 865

2   F.2d 1011, 1017 (9th Cir. 1988).

3       One seeking to dismiss criminal charges based on vindictive prosecution

4   need only show "some evidence" of vindictiveness. See *United States v. Martinez*,

5   105 Fed. Appx. 190, 193 (9th Cir. 2004) ("As to the vindictive prosecution claim,

6   we conclude that the district court applied the correct legal standard when it

7   required Martinez to produce 'some evidence tending to show the existence of the

8   essential elements of [the] particular claim.' *See United States v. One 1985*

9   *Mercedes*, 917 F.2d 415, 421 [9th Cir. 1990] [holding that a defendant seeking

10  discovery on a vindictive prosecution claim must make 'a prima facie showing of

11  a likelihood of vindictiveness by some evidence tending to sow the essential

12  elements of the defense.'").

13      Here, clearly there is "some evidence," and then some, to support the

14  "appearance" of vindictive prosecution, and the key such evidence came to light

15  after Mr. Yagman concluded serving his prison sentence.

16      As noted above, and as supported by documentary evidence not had before

17  trial or appeal, there exists a declaration under penalty of perjury from the lead

18  IRS agent, Charles Mullaly, whom the court did not permit Mr. Yagman to call as

19  a witness at trial, that the tip concerning and investigation of Mr. Yagman did not

20  begin until June, 2001. Until the emergence of that declaration, the only evidence

21  Mr. Yagman had on when the investigation had begun was Mullaly's supervisor,

22  Peter Alvarado's sworn declaration and hearing testimony, as well as Alvarado's

23  copy of a telephone message, to the effect that the investigation was prompted by

24  an anonymous telephone tip that Mr. Yagman had a villa in France and was

25  laundering money to France during yearly vacations. At trial, Mr. Yagman was

26  stuck with what Alvarado said. In sort order, both of these "facts" were verified by

27  the IRS to be completely false. Yet, having determined the falsity of these "facts,"

28

1    the IRS soldiered on and ramped up an investigation of Mr. Yagman. In the

2    normal course of criminal investigations the determination of the complete falsity

3    of this tip would have warranted the closing of the investigation. Now, with the

4    Mullaly declaration, Alvarado's testimony is completely impeached and there is

5    credible evidence, not just "some evidence," that Alvarado was lying and that the

6    investigation in fact began after the Ninth Circuit *en banc* cleared the last hurdle

7    from the progress of the Ruby Ridge homicide prosecution. The other person with

8    possible knowledge of this is Robert Solorio, whom the government claimed had

9    retired to Mexico and whom the government said it could not locate,

10    notwithstanding it was sending him pension checks.

11       On top of this is the further evidence that there is conflicting testimony and

12    statements to the court from prosecutrix Alka Sagar that there either was, or was

13    not, an ongoing grand jury investigation, and the fact that the way in which the

14    grand jury was convened was unusual in that it bypassed scrutiny because it was

15    set up to create a false appearance that the request for a grand jury came from an

16    attorney, when in fact it came from the IRS.

17       All of this more than passes the "some evidence" test, and Mr. Yagman

18    should be given the right to take testimony under oath from the parties who have

19    information on just how the investigation got started.

20       Hardly is it credible that, had the target not been Mr. Yagman that:

21       1. An anonymous tip that a person had a villa in France and was taking

22    money there to launder it, would be credited when:

23           A. It was found that person didn't have such a villa; and

24           B. Owed $54,000 in federal income taxes;

25       2. A record of such a real anonymous tip would be written down on the

virtual block of ice, here a plain piece of paper and not on IRS-marked paper, of which the original was no kept (so that it could be tested to determine when it was written);

3. Given the irreconcilable conflict between Alvarado saying the tip came in on April 16, 2001 and the investigation begun then and Mullaly's testimony that that occurred in June, 2001, Solorio would be missing and couldn't been found, as the only other person with information bearing on this crucial fact;

4. A multi-million-dollar investigation and prosecution would have gone forward.

Discovery is warranted based on newly-discovered evidence, and the court seriously should consider the vindictive/selective prosecution claim.

Though courts generally are unwilling to quash indictments on the basis of vindictive prosecution claims, *see, e.g., United States v. Hollywood Motor Car Co.,* 646 F.2d 384, 386 (9th Cir. 1981), and recognizing that a sequence of events is not enough to show vindictiveness, *see, e.g., United States v. Ali,* 27 Fed. Appx. 728, 732 (9th cir. 2001) ("'the link of vindictiveness cannot be inferred simply because the prosecutor's actions followed the exercise of a right, or because they would not have been taken but for the exercise of a defense right[,]'" *United States v. Gallegos-Curiel,* 681 F.2d 1164, 1168 (9th Cir. 1982), thus recognizing the *post hoc, ergo propter hoc* logical fallacy (sometimes referred to as the "false cause fallacy"), still here there is more than evidence of "this follows that." Instead, there is a stark and irreconcilable contradiction in government employee testimony, with the necessary implication that one of the witnesses has lied. And, if Alvarado lied, then Mullaly told the truth and the prosecution arose from the decision in the Ruby Ridge prosecution, and the government succeeded in concealing that material fact. And, given that prosecutrix Sagar fudged the issue of whether, or not, there was a grand jury in session, there is a basis for believing the

1  prosecution knew about the concealment and was part of a scheme for vindictive

2  prosecution. Thus, this is an "extreme case" in which not only the motivations of

3  the prosecutor, but also the motivations of the government agents, properly are in

4  issue. *See, e.g., United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001).  *See*

5  *also, United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995); *United*

6  *States v. Edmonds*, 103 F.3d 822, 826 (9th Cir. 1996); *United States v. McWilliams*,

7  730 F.2d 1218, 1221 (9th Cir. 1984).

8      This claim was not immediately appealable, *see United States v. Hollywood*

9  *Motor Car Co., 458 U.S. 263 (1982)*, and though this claim was raised on appeal,

10  it was without the benefit of Mullaly's declaration. Mr. Yagman should have a full

11  and fair opportunity now to litigate this claim.

12

13          Respectfully submitted,

14  By: _Stephen Yagman_

15      STEPHEN YAGMAN

16

17

18

19

20

21

22

23

24

25

26

27

28

11

**EXHIBIT 1**

# Thomas P. O'Brien

From Wikipedia, the free encyclopedia

**Thomas Peter O'Brien** is a lawyer, who is a partner in the Los Angeles office of Paul, Hastings, Janofsky & Walker. He was the United States Attorney for the for the Central District of California from October 2007 to September 2009. [1]

| Thomas Peter O'Brien |
|---|
|  |

| | |
|---|---|
| **Born** | unknown<br>Massachusetts |
| **Ethnicity** | Irish-American |
| **Spouse(s)** | Undisclosed |
| **Occupation** | Private Practice of Law |
| **Website** | [1]<br>(http://www.usdoj.gov/usao/cac/usa_bio.html) |

## Contents

- 1 Education and military service
- 2 Legal career
- 3 Controversies
- 4 Awards
- 5 References

## Education and military service

Mr. O'Brien graduated from the United States Naval Academy in 1981, and from the University of San Diego School of Law in 1993, where he was an Associate Editor of the San Diego Law Review and received his degree with honors. He accumulated 2,000 flight hours as a Radar Intercept Officer in the F-14 fighter aircraft, and is a graduate of the United States Navy Fighter Weapons School.[2]

## Legal career

O'Brien worked as Deputy District Attorney for Los Angeles County, California where he was assigned to the Hardcore Gang Division for more than five years. During that time, he tried approximately 65 cases, including dozens of gang murder cases, as well as cases involving allegations of rape, assault, kidnapping, car-jacking, counterfeiting, and narcotics trafficking.

O'Brien was a Chief of the United States Attorney's Office's Civil Rights Section, where he investigated and prosecuted federal hate crimes, racially motivated murders, human trafficking violations, and police misconduct cases.

O'Brien served as a Chief of the Criminal Division in the United States Attorney's Office.

After O'Brien resigned as U.S. Attorney during an investigation by the U.S. Justice Department Inspector General, the investigation uncovered that O'Brien stayed at exhorbitantly-pricey hotels while traveling at taxpayer expense and then sought government reimbursement by telling his secretary to lie

Case 2:10-cv-09033-SVW    Document 12    Filed 05/11/11    Page 14 of 24    Page ID #:735

and state falsely that more affordable rooms were not available. The report found that O'Brien's claims for reimbursement were "inappropriate and egregious" ethics violations. At first, O'Brien denied telling his secretary to make false statements, but when interviewed by investigators he then blamed his secretary, but the investigators found O'Brien's claims not to be either "credible or persuasive," the report said. [3] On November 17, 2010, an ethics complaint was filed with the California State Bar, based on the Inspector General's report.[4] and is pending.

# Controversies

- **Disbanding Of Public Corruption Unit** Shortly after taking office as the United States Attorney for the Central District of California, O'Brien disbanded the U.S. Attorneys office in Los Angeles whose target was corruption of public officials, elected officials, and other governmental regulators.[5]

He controversially launched, and then abruptly dropped, an inquiry of Cardinal Roger Mahony under the *honest services act*, a law which is usually only applied to public officials.

# Awards

- Named Prosecutor of the Month in July 2000 by the Los Angeles County Association of Deputy District Attorneys.
- Received the 2007 Anti-Defamation League Pacific Southwest Region's Helene and Joseph Sherwood Prize for combating hate.
- In October 2007, O'Brien received the Attorney General's Award for Exceptional Service, the Justice Department's highest award, for his role in successfully prosecuting four gang members who conspired to assault and murder African-Americans in the Highland Park neighborhood.[6]

# References

1. ^ "Presidential Nomination of Thomas P. O'Brien" (http://georgewbush-whitehouse.archives.gov/news/nominations/1188.html). U.S. White House. 2007-07-11. http://georgewbush-whitehouse.archives.gov/news/nominations/1188.html. Retrieved 2008-08-13.
2. ^ "THOMAS P. O'BRIEN, UNITED STATES ATTORNEY" (http://www.usdoj.gov/usao/cac/usa_bio.html). The United States Attorney's Office. http://www.usdoj.gov/usao/cac/usa_bio.html. Retrieved 2008-08-13.
3. ^ Los Angeles Times, November 11, 2010.
4. ^ Leslie Brodie Report blog, November 17, 2010.
5. ^ STEVEN M. ELLIS (2008-03-31). "The Political Specter at Justice" (http://www.nytimes.com/2008/03/31/opinion/31mon2.html?ei=5124&en=77b8dc8d85b68824&ex=1364616000&exprod=permalink&partner=permalink). The New York Times. http://www.nytimes.com/2008/03/31/opinion/31mon2.html?ei=5124&en=77b8dc8d85b68824&ex=1364616000&exprod=permalink&partner=permalink. Retrieved 2008-08-13.
6. ^ STEVEN M. ELLIS (2007-10-03). "Department of Justice Honors O'Brien, 11 Others" (http://www.metnews.com/articles/2007/usat100307.htm). Metropolitan News-Enterprise. http://www.metnews.com/articles/2007/usat100307.htm. Retrieved 2008-08-13.

Retrieved from "http://en.wikipedia.org/wiki/Thomas_P._O%27Brien"
Categories: United States Attorneys for the Central District of California | United States Naval Academy alumni | University of San Diego alumni | United States naval aviators | Living people

**EXHIBIT 2**

Former U.S. Atty. O'Brien stayed at pricey hotels, blamed secretary, report claims | L.A. ...   Page 1 of 10

Case 2:10-cv-09033-SVW   Document 12   Filed 05/11/11   Page 16 of 24   Page ID #:737

Subscribe/Manage Account   Place An Ad   LAT Store   Jobs   Cars   Real E:

# Los Angeles Times | LOCAL

LOCAL   U.S.   WORLD   BUSINESS   SPORTS   ENTERTAINMENT   HEALTH   LIVING   TRAVEL

L.A. NOW   POLITICS   CRIME   EDUCATION   O.C.   WESTSIDE   NEIGHBORHOODS   ENVIRON

IN THE NEWS:   SUPER BOWL   |   EGYPT   |   RONALD REAGAN   |   WRITERS GUILD AWARDS   |   UFC   |   LAKERS·

LET'S MAKE SURE EVERYONE HAS   AFFORDABLE HOUSING FINANCIAL STABILITY QUALITY EDUCATION   Unite Wa CREATIN

# L.A. NOW

SOUTHERN CALIFORNIA — THIS JUST IN

*From the metro staff of the Los Angeles Times and...*

KTLA 5 NEWS   FOX 5 SAN DIEGO 

L

Crime | Government | Medical marijuana | Education | Prop 8 | Traffic | Westside

## Former U.S. Atty. O'Brien stayed at pricey hotels, blamed secretary, report claims

(16)   (0)   Comments (

November 11, 2010 | 5:02 pm

Case 2:10-cv-09033-SVW   Document 12   Filed 05/11/11   Page 17 of 24   Page ID #:738



Former U.S. Atty. Thomas P. O'Brien stayed at pricey hotels while traveling on business then sought to justify reimbursement by telling his secretary to falsely state that more affordable rooms were not available, an audit made public this week alleges.

O'Brien was one of five U.S. attorneys whose travel expenses were singled out in a report by the Department of Justice's inspector general. The report found that some of O'Brien's claims for reimbursement were "inappropriate and egregious violations" of the travel policies governing federal prosecutors.

O'Brien, now in private practice, denied engaging in any  misconduct but said he takes "full responsibility" for any oversights that resulted in his exceeding approved spending limits. He added that all his travel had been approved by officials in Washington, D.C. Though he has not been asked repay any money, O'Brien said he wrote a check for $903 on Tuesday to pay for cases in which he stayed in rooms that cost more than the approved rate.

O'Brien, who served as U.S. attorney in Los Angeles from October 2007 to September 2009, denied telling a secretary to make any false statements. Reviewers examined the records of 208 people who served in one of the 93 U.S. attorney posts nationwide between 2007 and 2009.

Auditors identified 16 people for closer examination due to the significant number or percentage of claims for reimbursement above the government rate, the report said. O'Brien was one of five top prosecutors who "exhibited a noteworthy pattern of exceeding the government rate and whose travel documentation provided insufficient, inaccurate or no justification" for doing so.

Of 23 hotel vouchers O'Brien submitted during his tenure, six were for more than the allowable rate and provided insufficient justification. The total overage was $903. The report noted that near the en

Former U.S. Atty. O'Brien stayed at pricey hotels, blamed secretary, report claims | L.A. ...    Page 3 of 10

Case 2:10-cv-09033-SVW    Document 12    Filed 05/11/11    Page 18 of 24    Page ID #:739

of his tenure, after having been told he should pay the difference between the government rate and the cost of a room at a preferred hotel, O'Brien did so for his lodging at a conference in Palm Springs O'Brien was identified only as "U.S. Attorney D" in the 34-page report, but confirmed in an interview with The Times that that designation referred to him.

The report detailed several instances in which he allegedly rejected approved hotels in favor of his personal preference. In one case, O'Brien, who lives in the Los Angeles, was scheduled to speak at a morning conference in Anaheim.

He booked a hotel to avoid the morning rush-hour commute. But rather than book a room at the conference hotel for $143 a night, he opted for a room 20 miles away in Newport Beach for $349 a night. The report said O'Brien "provided no explanation" as to why he did not stay in Anaheim. On another occasion, O'Brien had his secretary book a room at the hotel where a conference he was attending was being held, but told her to book a room that exceeded the conference rate so he could have a better view, the report states.

In such instances, the secretary told auditors, O'Brien told her to write that the conference-rate room were "sold out" to justify the more expensive lodgings. When interviewed by investigators, O'Brien blamed his secretary for selecting the more expensive rooms on her own and denied telling her to misrepresent the reason for the increased expenditures, the report states.

If she said otherwise, O'Brien told investigators, "it was to cover her own misconduct." The investigators did not find such claims "credible or persuasive," the report said.

--Scott Glover

Photo: Reuters

Email: newstips@latimes.com
Twitter: @latimescitydesk @lanow
Facebook: latimescitydesk

More in: Crime and courts

ADS BY GOOGLE

**White Collar Crime Lawyer**
Best Lawyers' Top White Collar Atty Criminal Defense Firm (949)369-3700
bmkattorneys.com

**James O'Brien, CPA®**
Managing Partner of Denver-based Gill Capital Partners.
www.gillinvest.com

## Verify your Comment

## Previewing your Comment

# Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

# Former U.S. attorney for L.A. criticized for his travel expenses

*Thomas P. O'Brien stayed at costly hotels and justified his reimbursement by telling his secretary to write that more affordable rooms were unavailable, a federal audit finds. O'Brien reimburses the government.*

November 12, 2010 | By Scott Glover, Los Angeles Times

Former U.S. Atty. Thomas P. O'Brien stayed at pricey hotels while traveling on business and then sought to justify the expense by having his secretary falsely state that more affordable rooms were not available, an audit made public this week alleges.

O'Brien was one of five U.S. attorneys whose travel expenses were singled out in the report by the Department of Justice's inspector general, which found that some of O'Brien's claims for reimbursement were "inappropriate and egregious violations" of the travel policy.

O'Brien, now in private practice, denied engaging in any misconduct, but said he takes "full responsibility" for any expenses that may have exceeded approved spending limits. He added that all his travel had been approved by officials in Washington, D.C. The day after he was contacted by The Times, O'Brien said, he wrote a check Tuesday to pay for cases in which he stayed in rooms that cost more than the approved rate.

O'Brien, who served as U.S. attorney in Los Angeles from October 2007 to September 2009, denied telling a secretary to falsify records.

Reviewers examined the records of 208 people who served in one of the 93 U.S. attorney posts nationwide between October 2007 and March 2009. They chose those people for closer examination due to the significant number or percentage of claims for reimbursement above the government rate.

O'Brien was one of five top prosecutors who "exhibited a noteworthy pattern of exceeding the government rate and frequently provided either insufficient, inaccurate or no justification" for doing so. Of 23 hotel vouchers O'Brien submitted during his tenure, he exceeded the government rate 11 times and provided insufficient justification. The total overage was $903.

The report noted that near the end of his tenure, after having been told he should pay the difference between the government rate and the cost of his preferred hotel, O'Brien did so for his lodging at a conference in Palm Springs.

O'Brien was identified only as "U.S. Attorney D" in the 34-page report, but confirmed to The Times that that designation referred to him. The report cited several instances in which he allegedly rejected approved hotels in favor of his personal preference.

In one case, O'Brien, who lives in Los Angeles, was scheduled to speak at a morning conference in Anaheim. He stayed overnight to avoid the commute. But rather than book a room at the conference hotel for $143 a night, he chose a room 20 miles away that cost more.

The inspector general's report said O'Brien "provided no explanation" as to why he did not stay in Anaheim.

On another occasion, O'Brien had his secretary book a room at the hotel where a conference he was attending was held, but at a price that exceeded the conference rate so he could have a better view, the report states.

In such instances, the secretary told auditors, O'Brien told her to write that the conference-rate rooms were "sold out."

When interviewed by investigators, O'Brien blamed his secretary for selecting the more expensive rooms on his behalf.

Case 2:10-cv-09033-SVW   Document 12   Filed 05/11/11   Page 20 of 24   Page ID #:741

reason for the increased expenditures, the report states. If she said otherwise, O'Brien told investigators, "it w

The investigators did not find such claims "credible or persuasive," the report said.

"We do not believe that the secretary would have taken these actions on her own initiative," the report states.

In an interview Thursday, O'Brien denied blaming any one individual in his office for anything.

scott.glover@latimes.com

---

**Los Angeles Times**   Copyright 2011 Los Angeles Times                          Index by Key

**EXHIBIT 3**

The Leslie Brodie Report

### Recent posts

- Update 4: Communication between Confidetial Complainant and Howard Rice's Pamela Phillips and Sean SeLegue by lesliebrodie on 03/02/2011
- Massively Reckless by lesliebrodie on 02/02/2011
- Read Jerome Falk's Letter to Engstrom Lipscomb & Lack's Walter Lack by lesliebrodie on 31/01/2011
- Meet a Son of Eve, an Illegitimate Child; a Latino; a Precocious Child; a Victim; a Homosexual; an Acclaimed Novelist; a Lawyer; a Religious Leader; a Wife; a Judicial Canidate, and J. Moreno's Staff-Attorney - - Meet Michael Nava (Part 1) by lesliebrodie on 29/01/2011
- David Cameron Carr: "It is Good to Be King" by lesliebrodie on 27/01/2011
- All Roads Lead to Loyola - - Just Don't Drive a Ford Explorer by lesliebrodie on 25/01/2011
- Nisperos' Ethics Byte by lesliebrodie on 23/01/2011
- Jacqueline Scott Corley to Exit Kerr & Wagstaffe by lesliebrodie on 22/01/2011
- Up Up and Away by lesliebrodie on 21/01/2011
- The Chosen Dunn by lesliebrodie on 20/01/2011

more posts...

« Contemptible Abuse of United Kingdom Legal System as to the State of Israel and Dr. Michael Savage.

The Gospel of APA, Par weekend in Los Angele American Lawyers an "PUTTIN' ON THE

# Formal Ethics Complaint to the State B California against Former U.S. Atto Thomas P. O'Brien

by lesliebrodie Pro @ 17/11/2010 – 09.00.00

November 17, 2010

Intake Unit/Office of the Chief Trial Counsel
State Bar of California
1149 South Hill Street
Los Angeles, California 90015-2299

VIA FACSIMILE & UK MAIL

## I. INTRODUCTION & NOTICE OF COMPLAINT:

Please register a formal ethics complaint against Mr. Thomas P. (Bar No. 166369) for misconduct relating to exceeding approve spending limits while serving as the U.S. Attorney for the Central D California.

## II. SUMMARY OF FACTS:

Respondent Mr. Thomas P. O'Brien ("O'Brien") is a member of th Bar of California. He graduated from the United States Naval Aca 1981, and from the University of San Diego School of Law in 1993 he was an Associate Editor of the San Diego Law Review and rece degree with honors. Presently, O'Brien is a litigation partner wi Hastings in Los Angeles, where he leads the firm's west coas Collar practice group.

From October 2007 to October 2009, O'Brien served as the United Attorney for the Central District of California. It was during this time that O'Brien engaged in misconduct by knowingly staying in hotel which he knew exceeded his approved spending limits.

Of the 23 hotel vouchers O'Brien submitted during his tenu exceeded the allowable rate and provided insufficient justificatio total overage was $903. A recent report by the Department of J Inspector General found that a few of O'Brien's claims for reimbur were "inappropriate and egregious violations" of the policies go federal employees. Moreover, the Department of Justice's In General found that O'Brien exhibited a noteworthy pattern of ex the government rate, and that his travel documentation p insufficient, inaccurate, or no justification for these excesses.

According to the Los Angeles Times when interviewed by inves O'Brien blamed his secretary for selecting the more expensive ro her own and denied telling her to misrepresent the reason increased expenditures, the report states. If she said otherwise, told investigators, "it was to cover her own misconduct."

Please note that we have cited the above report by the Inspector for your reference; however, after having fully familiarized ourse the circumstances surrounding O'Brien's travels, as well subsequent statements and actions, we are only able to po certainty to one instance in which O'Brien exceeded the allowable by $206 without providing adequate justification or explanation.

Specifically, O'Brien, who lives in Los Angeles, was scheduled to c speech at a morning conference in Anaheim. Rather than driving fi Angeles to Anaheim on the morning of the conference, O'Brien c travel to Orange County the previous night in order to avoid the ru commute. However, rather than booking a room at the conferen for $143 per night, he opted to stay in a hotel situated 20 miles Newport Beach for $349 a night. The Inspector General's repor that O'Brien "provided no explanation" for his decision not to sta Anaheim hotel.

It is certainly plausible that O'Brien -- who in addition to being t Attorney for the largest district in the U.S. and was the main speak conference -- wanted to isolate himself the previous night in c prepare and rehearse his speech. If he had stayed at the Anahei where the convention was held, he could have, for example, have

old friends and colleagues and felt an obligation to socialize wit
Another plausible explanation is that O'Brien wished to maintain a
professional distance from his subordinates by not encountering
the dining room and the gym, for example.

If O'Brien provides the State Bar of California with an explan:
justification similar to the above regarding his decision to stay in I
Beach rather than Anaheim, we ask that this complaint be withdraw

In addition, after carefully reviewing the report issued by the Ir
General, Complainant finds it legally insufficient and lackin;
sufficient to sustain any accusations against O'Brien as it is p
based on hearsay evidence that was not subjected to vigorous
examination. Most troubling is the claim by the secretary that
O'Brien who instructed her to exceed the allowable budget. .
plausible explanation is that the secretary wished to curry favor ·
supervisor -- the person who evaluates her performance and
whether or not she will obtain a raise and be promoted.

Given O'Brien's stellar career, his unparalleled contribution
community, the fact that he is otherwise a model citizen, his spon
payment of restitution and the secretary's lack of credibility, com
asks that the State Bar privately reprove O'Brien if he fails to
justification or explanation for his decision to stay in the hotel in I
Beach, rather than Anaheim.

Please do not hesitate to contact me directly at lesliebrodie@gm
you need further information or have any questions.

Leave a comment      Recommend / Bookmark
Tags:       Chief Trial Counsel   Intake Unit   Paul Hastings   State Bar of Ca
Thomas P. O'Brien

Show trackback address

## o Comments to Formal Ethics Complaint t State Bar of California against Former Attorney Thomas P. O'Brien

**Leave a comment** (Login)